**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| JUNIOUS VITAL, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-12-1357 |
| | § | |
| NATIONAL OIL WELL VARCO, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

The plaintiffs in this employment-discrimination case are Junious Vital, Damon Darby, Herbert Heard, Billy Rose, Jerome Johnson, Edward Jiles, DeWarren Bellard, and David Lane. All are African-American men who were or are still employed by the defendant, National Oil Well Varco ("NOV"). (Docket Entry No. 3). NOV moved to dismiss some claims as to each plaintiff because although each case is different, the plaintiffs pleaded globally. (Docket Entries No. 18, 19, 20, 21, 22, 23, 24, 25). The plaintiffs responded, (Docket Entry No. 33), and NOV replied, (Docket Entry No. 38). Based on the complaint, the motions and responses, and the relevant law, this court grants NOV's motions. The dismissal is without prejudice and with leave to amend.

The reasons are explained below.

**I.     Background[1]**

> **A.     The Plaintiffs' Allegations**

>> **1.     Junious Vital**

---

[1] These allegations, which this court takes as true for the purpose of ruling on NOV's motions, come from the plaintiffs' complaint, (Docket Entry No. 3), unless otherwise indicated.

NOV hired Junious Vital in May 2008.  NOV required him to work 12 to 14 hours a day but often let his non–African-American coworkers leave the work facility earlier.  When Vital complained, his supervisor told him that if he did not work his shifts as assigned he would be written up for insubordination.  A coworker who trained Vital recommended promotion to Lead, but Vital's supervisor refused.  Vital's supervisor and another NOV manager told him that he was already a "[l]ead man."  According to Vital, this meant that he was required to perform the duties of a Lead but did not receive commensurate title or pay.  No non–African-Americans performed similar duties without commensurate title and pay.

Vital trained two African-American coworkers.  NOV fired both employees after Vital trained them.  NOV managers told Vital and an African-American coworker to train another employee who was not African-American.  NOV promoted this employee over Vital, made him a manager, and gave him supervisory responsibility over Vital.  NOV required Vital to train several employees who later became his supervisors.

NOV closed the Houston facility where Vital worked in 2009.  Non–African-American employees requested and received transfers to other NOV facilities close to their homes.  NOV transferred Vital to a facility 140 miles from his home and it was not until months later that he was transferred to a closer facility.

In January 2010, NOV Distribution Manager Sean Leahman told Vital that he was not being productive and stated, "I have a lot of people watching you."  Vital and his African-American coworkers complained repeatedly about the "racial atmosphere" at NOV.  Vital heard coworkers and supervisors use the word "nigger" on a daily basis.  African-American employees avoided the company lunchroom to avoid hearing racial slurs.  In January 2011, Vital reported being called a

"Black African Monkey," but his supervisors did nothing.  In March 2011, a non–African-American coworker circulated a picture of Vital showing his head superimposed on a monkey's body.  Vital complained, but management did nothing.

Vital asked for permission to attend school under NOV's tuition-assistance program.  NOV approved his participation and tuition assistance, but his managers refused to accommodate his class schedule.  He missed classes frequently as a result.  NOV managers accommodated the schedules of Vital's non–African-American coworkers.  Vital's grades qualified him for a "co-op" program that would have let him receive class credit for work at NOV.  NOV management refused this request but allowed non–African-American employees to participate.  When Vital finished school, NOV refused to let him work in a department he was then qualified to work in.  NOV did not deny such opportunities to non–African-American employees with similar education.

Vital was disciplined twice in February 2011 for improperly packaging a shipment and for "slacking off."  Vital packed the shipment correctly and had worked harder than his non–African-American workers on the day in question.  In March 2011, a manager wrote Vital up for coming in early, but coming in early to work violated no NOV policy and no non-African-Americans were written up for coming in early.  In April 2011, a manager wrote up Vital for taking an unauthorized break, but a supervisor had instructed him to take the break.

In March 2011, Vital asked NOV to change his assignments to eight-hour shifts.  NOV personnel told Vital that his shifts would be reduced only if he took Family and Medical Leave Act ("FMLA") leave.  Non–African-American employees were routinely allowed to work eight-hour shifts.

Vital took FMLA leave in April 2011 to care for his sick mother.  NOV approved the leave until July 31, 2011.  NOV terminated Vital's employment on July 21, 2011.  Vital tried to return to work, but his manager said all he could do was reapply after July 31, 2011.  Vital reapplied, but NOV refused to interview him for any position.

### 2.     Damon Darby

NOV hired Damon Darby in November 2009 as an Order Puller.  Darby requested raises and promotions several times, but NOV refused.  Darby complained to management that he felt he was being considered for raises and promotions differently than non–African-Americans.  NOV managers told Darby to wait and be patient.  Like Vital, Darby heard his coworkers repeatedly use racial slurs and complained about the slurs to management without effect.  The most recent promotion Darby applied for was given to a less-qualified non–African-American who had just been hired and who Darby was required to train.

### 3.     David Lane

NOV hired David Lane as a Quality Control Inspector in September 2008.  David Lane and his brother Allen were the only African-Americans in the West Gulf Bank Quality Control Department, and Allen Lane was the only African-American Lead at NOV at the time.  NOV required David and Allen Lane to work 90-day probationary periods as new hires, but made non–African-American workers permanent employees almost immediately.

David Lane's supervisor, John Bindinger, used racial slurs, including "nigger," directed toward Lane.  When Lane complained, Bindinger threatened, "If you are going to be sensitive you ain't going to work for me."  Bindinger did not treat non–African-American employees this way. In 2009, Lane requested a promotion and permission to take the classes necessary for promotion.

4

Bindinger denied Lane's requests multiple times.  Lane said he would ask the plant manager directly, but Bindinger told Lane not to waste his time because the plant manager would not speak to him.  Lane complained that he was being held back because of race, but Bindinger ignored the complaint.

At the end of 2009 and into 2010, when Lane had been working at the facility for a year and a half, a new non–African-American employee arrived.  The plant manager and Bindinger immediately sent this employee to school and then promoted him.  They also sent this employee to trade shows, which are important to attend to be eligible for further promotions.  Lane asked for raises during this time but was denied because he lacked experience, which he could not get without the training NOV continued to deny him.

NOV management treated Lane differently from non–African-American employees in other ways.  He was required to remove religious references from his email signature, while non–African-American employees were not required to do so.  Bindinger told Lane he would block any referrals if he applied for promotions at other NOV facilities.  Lane never received cost-of-living adjustment increases that his non–African-American coworkers received.  When a new product line was rolled out in 2010–2011, African-American employees were not invited to inspect and discuss the new products. The burden of covering for non–African-American employees who were attending school for promotions  fell on Lane, who had to work extra to cover their shifts.  Lane was required to work night shifts, but non–African-American employees were not required to work nights.

Lane observed racial graffiti at the NOV facility.  He complained about it to management, but they did nothing.  He heard the word "nigger" routinely in everyday discussions in the break room.  He complained, but management did nothing.

5

Shortly after Lane complained to management about Bindinger, Lane was written up for an absence and for clocking out early.  Other employees complained that Bindinger was racially harassing African-Americans, but management did not investigate.  After the incidents that led to the complaint against Bindinger, the African-Americans who worked at Lane's facility were all fired.  NOV fired both David and Allen Lane in August 2011 and replaced them with non–African-Americans.  The reasons for firing Lane included alleged discipline for absences that never happened, and for a write-up in February 2011 that Lane did not receive.

### 4.      Herbert Heard

NOV hired Herbert Heard in April 2006 as a Materials Handler.  He heard racial slurs, including "nigger," almost every day at work and saw racial graffiti at NOV facilities.  He complained to supervisors, but nothing was done.  He also complained to higher management that a non–African-American supervisor circulated a photo showing Heard's head on a monkey's body.  The supervisor was not investigated or disciplined.

Heard applied for several promotions, which would have also meant a pay raise, starting in 2006.  A non–African-American employee who was less qualified was selected for one promotion, and Heard was required to train this employee.  Heard was also required to perform the same tasks as this employee, but without the higher pay and title.  After the most recent unsuccessful bid for a promotion in 2011, Heard's managers told him to leave early.  He was written up after he became "visibly upset" and "emotional."  NOV fired Heard in August 2011 "for pre-textual reasons."

### 5.      Billy Rose

NOV hired Billy Rose in December 1977.  Rose worked in an NOV warehouse from 1977 to 2000, when he was moved to the shipping department as a Shipping Coordinator.  NOV

terminated Rose's employment in 2005 while relocating the facility where he worked.  Less qualified non–African-American employees were relocated rather than terminated.  NOV rehired Rose in 2006 as a Shipping Coordinator at the new site.

Rose saw racial harassment at NOV on numerous occasions.  He saw a non–African-American employee wearing Confederate-flag suspenders some time in the 1970s.  In 2007, he complained to a manager about coworkers using the slur "nigger."  Nothing was done.  In 2011, Rose and several African-American coworkers stopped going to the break room because coworkers were using the slur.  Rose saw the non–African-American employee circulate the offensive photo of Vital in March 2011.

In March 2011, a manager wrote up Rose for "coming in early."  Rose was supposed to get a written performance review in June 2011.  A review is a prerequisite for promotion.  Rose did not receive a performance review; non–African-American workers did get their reviews.  In November 2011, a non–African-American employee who Rose had trained was given Rose's former position as shipping coordinator.  NOV paid this employee more money than Rose had made in the position.  Rose received a 5% pay raise in 2011, but a non–African-American employee with substantially less experience who worked the same job received a 9% raise.

### 6.    Jerome Johnson

NOV hired Jerome Johnson in March 2010 as a Shipping Clerk.  Of the approximately 400 employees at Johnson's worksite, 25 were African-American.  In July 2011, Johnson's supervisors required him to take a drug test after a workplace accident, but did not require a non–African-American coworker to be tested after a similar accident.

In August 2011, Johnson applied for and was denied a promotion to a Field Tech position. The job was given to a less qualified non–African-American.  Johnson asked for a raise from his manager.  His manager refused, falsely stating that Johnson's salary was already the highest at the worksite and that Johnson would have to wait three months before he could request a raise.  After Johnson's request, however, his managers scrutinized his work constantly.  Someone within management gave his email login information to his coworkers, which caused Johnson to be disciplined for allowing unauthorized email usage.  Johnson complained about repeated racial slurs and graffiti, but nothing was done.  Johnson was constructively discharged in February 2012.

### 7.     Edward Jiles

NOV hired Edward Jiles in August 2010 as a Materials Handler.  In June or July 2011, Jiles switched from Materials Handler to Forklift Loader, but his supervisor took that position away in less than a month and gave it to a less qualified non–African-American.  Jiles went back to his old position as a Materials Handler.

On September 15, 2011, Jiles's supervisor called him a "nigger."  That same day, Jiles asked for and received his supervisor's permission to go to a doctor's appointment, but his supervisor later told another employee that Jiles was not really sick and had left early because it was payday.  Jiles called NOV's HR department that day to complain, but his call was not returned.  Jiles often heard coworkers use the slur "nigger" and frequently saw graffiti with that word frequently.

Jiles's supervisor constantly told him that he was not working quickly enough.  On one occasion, Jiles responded that he was slow because he was working with a very heavy load.  His supervisor told him to go home if that was as fast as he could work. Non–African-American employees were never spoken to that way.  Jiles went home, but he called the HR department, who

told him to report to work the next day.  Jiles continued to work but felt pressure not to ask for help working with heavy loads because employees routinely got in trouble for working too slowly and not meeting quotas.  Jiles was eventually injured by lifting a heavy load without help.

Jiles asked for several reviews and pay raises.  All were denied.  In January 2011, Jiles asked his manager for a performance review, but his manager never provided one.  A different manager did the same thing in the summer of 2011.  Jiles asked for a review and a merit raise in November 2011but never received either.  Non–African-American employees received both.

In June 2011, Jiles was working at an NOV facility with a reputation for being an easier area to work.  NOV management replaced Jiles with a non–African-American, who was also given a raise so that he was paid more than Jiles to do the same job.

Jiles applied for four or five promotions.  Each was denied.  The promotions went to non–African-Americans who were hired by NOV after Jiles and who were not as qualified as Jiles. Jiles complained to managers and to HR that he was being discriminated against.  HR personnel never returned his calls or investigated his allegations of unfair treatment, racial hostility, or harassment.

Jiles was hurt on the job in December 2011.  While away from work, NOV fired him for "not coming to work."  He received no written termination letter.  Instead, he was called to a meeting at which management presented him three writeups from March 2012 for "not coming to work."  The writeups were for days that an NOV safety manager had told Jiles not to come to work because he was taking medication that caused dizziness.

### 8. DeWarren Bellard

NOV hired DeWarren Bellard in 2005 as a Helper.  He became an Order Puller in the shipping department in 2006.  He applied for a promotion to Lead in 2011 but management gave the position to a less-qualified non–African-American.  From 2007 to 2011, Bellard routinely trained newly hired non–African-American employees who were promoted over him.  He observed and reported his coworkers' frequent use of racial slurs and graffiti.  In January 2011, Bellard complained to his manager that a coworker called him a "nigger" and a "black monkey."  The manager made the coworker apologize, but the behavior continued.

Bellard's supervisor treated African-American and non–African-American employees differently.  He made sure Bellard and his African-American coworkers were punctual in returning from breaks.  Non–African-Americans were allowed to be away as long as they wished, and were allowed to take smoke breaks that African-Americans were not.  Bellard and his African-American coworkers were required to work 12 hours a day while his non–African-American coworkers were not.

In April 2011, Bellard took FMLA medical leave.  On the day he returned to work in June 2011, NOV summarily terminated his employment for making "too many mistakes."

## B.    This Lawsuit

The plaintiffs filed this suit on May 1, 2012.  (Docket Entry No. 3).[2]  All plaintiffs alleged race discrimination  on both disparate treatment and hostile work environment theories under Title VII, (*id.* at 28–29), 42 U.S.C. § 1981, (*id.* at 31–32), and Section 21.051 of the Texas Labor Code, (*id.* at 35–36).  The plaintiffs also sued for retaliation under Title VII, (*id.* at 30), § 1981, (*id.* at 34),

---

[2]  The plaintiffs filed two other complaints on the same date.  (Docket Entries No. 1, 2). These complaints appear to have been docketed in error.

and the Texas Labor Code, (*id.* at 37).  With each claim, the plaintiffs pleaded that they were subjected to discrimination or retaliation by "Termination of employment; Suspension; Failure to train; Wrongful discipline; Constructive discharge; Unequal pay; Failure to perform written performance reviews; Failure to provide educational benefits; [and] Working out of class."  The first paragraph of each cause of action incorporates by reference all facts alleged in the prior paragraphs. None of the claims for relief includes information about which specific plaintiff's or plaintiffs' factual allegations gave rise to which claim.

NOV moved to dismiss.  (Docket Entries No. 18, 29, 20, 21, 22, 23, 24, 25).  NOV filed eight separate motions — one for each plaintiff — with the same arguments.  NOV sought dismissal because the complaint globally alleges that the "Plaintiffs" suffered acts of discrimination or mistreatment, although the facts pleaded in the complaint made clear that only some of the plaintiffs experienced some of the actions.  NOV also sought dismissal on the basis that some of the claims were not based on ultimate employment decisions.  As to plaintiffs Heard and Rose, NOV also argued that the four-year statute of limitations for § 1981 claims had run on several claims.[3]  (Docket Entries No. 20, 24).  The plaintiffs filed a consolidated response to the motions to dismiss, (Docket Entry No. 33), and NOV replied, (Docket Entry No. 38).

## II.    The Legal Standard for Motions to Dismiss

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007),

---

[3] NOV argues that to the extent these allegations are outside the limitations period under 42 U.S.C. § 1981, they likely also fall outside the limitations periods under Title VII and the Texas Labor Code.  But because NOV is constrained to the face of the complaint and the complaint contains no allegations about the dates of filing administrative charges, NOV does address the timeliness of certain allegations under Title VII and the Texas Labor Code at this time.

and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. 544).  The Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555).

When a plaintiff's complaint fails to state a claim, a district court generally should provide the plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice.  *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case"); *see also United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion." (internal citation omitted)).  "Denial of leave to amend may be warranted for undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility of a proposed amendment." *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 270 (5th Cir. 2010) (emphasis added).  A district court has broad discretion to dismiss a complaint without leave to amend "where the plaintiff has previously been granted leave to amend [to cure pleading deficiencies] and has subsequently failed

to add the requisite particularity to its claims[.]" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009); *see also Carroll v. Fort James Corp.*, 470 F.3d 1171, 1175 (5th Cir. 2006) (affirming a district court's dismissal for failure to state a claim without leave to amend after the court "instructed [the plaintiffs] to plead their fraud claim with greater particularity, but the amended complaint was still woefully inadequate").

## III.   Analysis

The plaintiffs do not argue that each has pleaded facts sufficient to establish a claim for discrimination or retaliation for every employment action mentioned in the complaint.  NOV does not argue that it is entitled to dismissal of the claims as to which the plaintiffs have alleged facts showing that they suffered an ultimate employment decision.  NOV has not challenged any of the hostile work environment claims for present purposes.  (Docket Entry No. 38, at 1 n.1).  NOV seeks to dismiss only the claims as to each plaintiff to the extent that it they are (1) based on employment actions for which the individual plaintiff has pleaded no facts, and (2) based on employment actions that are not ultimate employment decisions.

The plaintiffs' opposition appears to misperceive NOV's motions.  The plaintiffs essentially respond that each has alleged at least some factual basis that entitles him to relief.  They also point out that each plaintiff suffered at least one ultimate employment decision.  The plaintiffs cast the motions as improperly framed motion to strike under Rule 12(f) of the Federal Rules of Civil Procedure.  NOV's motions are, however, motions to dismiss based on limited grounds.  NOV does not seek to dismiss discrimination claims that allege an ultimate employment decision.  Nor does NOV seek dismissal of discrimination and/or retaliation claims to the extent that each claim is based on the treatment each plaintiff allegedly suffered.

### A.    Retaliation and Discrimination

The plaintiffs do not argue that they have alleged sufficient facts as to all ten employment actions mentioned at some point in the complaint.  For example, with respect to the plaintiffs' claims of alleged discriminatory termination, the plaintiffs' response acknowledges that neither Darby nor Rose has pleaded any facts to suggest that their employment was terminated.[4]  Similarly, the plaintiffs acknowledged that neither Bellard nor Heard alleged facts showing "discrimination in compensating."  (Docket Entry No. 33, at 25–26).  NOV is entitled to dismissal of discrimination or retaliation claims for any plaintiff who has not pleaded facts to suggest that they suffered the particular alleged employment action.

With respect to dismissal of their retaliation claims, the plaintiffs oppose only the dismissal of retaliation claims asserted by Darby and Johnson.  The motions to dismiss the retaliation claims asserted by Bellard, Heard, Jiles, Lane, Rose, and Vital, based on employment actions for which these plaintiffs pleaded no facts, are not opposed and are granted.

The plaintiffs concede that "[t]o state a claim of retaliation sufficient to withstand a 12(b)(6) motion, a plaintiff must state factual allegations, or those from one could reasonable infer, that (1) he engaged in protected activity; (2) he experienced an adverse employment action following the protected activity; and (3) a causal link existed between the protected activity and the adverse employment action."  (Docket Entry No. 27, at 33 (citing, inter alia, *McCoy v. City of Shreveport*, 492 F.3d 551, 556–57 (5th Cir. 2007) (additional citations omitted)).  Darby alleged no facts showing that his alleged opposition to discrimination or harassment resulted in the denial of a raise

---

[4] Darby alleged that he was denied raises and a promotion.  He stated no facts to suggest that he was terminated, suspended, not trained, disciplined, constructively discharged, denied written performance reviews, denied educational benefits, or made to work out of class.

or promotion.  Rather, Darby relies on the conclusory statement in Paragraph 155 of the complaint to support his claim that he has pleaded a causal connection between his protected activity and lack of raise or promotion.  (*Id.*)  But Paragraph 155 does not allege a failure to promote or award raises as retaliatory employment actions.  Darby has alleged no facts to suggest that the lack of promotion and raises were causally related to his opposition to discrimination or harassment.  Darby has failed to state a claim for retaliation.

Similarly, Johnson has not pleaded facts showing that his constructive discharge was causally related to his opposition to harassment or discrimination.  Johnson alleges that he complained about harassment or discrimination on undisclosed dates and was constructively discharged in February 2012.  (Docket Entry No. 3, ¶¶ 105–08).  Absent factual allegations of complaints about harassment or discrimination, including when such complaints were made, Johnson has failed to plead a causal connection between any complaints and his constructive discharge based on temporal proximity, and he has alleged no facts otherwise suggesting a causal connection.  The motions to dismiss the retaliation claims are granted.

### B.    Ultimate Employment Actions

As to all plaintiffs but Darby, NOV argues that they have alleged claims based on employment actions, such as failure to train, that were not ultimate actions.  The plaintiffs concede that with respect to their discrimination claims, "[a]dverse employment actions . . . are limited to 'ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating.'"  (Docket Entry No. 33, at 25 (quoting *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004))).  The plaintiffs, however, argue that certain employment actions, such as denial

of performance evaluations and training, should be considered ultimate employment actions because they are prerequisites for ultimate employment actions.  (*Id.* at 26).

"As to discrimination claims, 'Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions.'"  *Preston v. Tex. Dep't of Family & Prot. Servs.*, 222 F. App'x 353, 358 (5th Cir. 2007) (quoting *Dollis v. Rubin*, 77 F.3d 777, 781–822 (5th Cir. 1995) (per curiam)); *see also Messer v. Meno*, 130 F.3d 139, 140 (5th Cir. 1997) (determining that ultimate employment decisions include "hiring, discharging, promoting, compensating, or granting leave," but not "disciplinary filings, supervisor's reprimands, and even poor performance by the employee").  Denials of training and performance reviews are not themselves ultimate employment decisions.  *See Wojciechowski v. Nat'l Oilwell Varco, L.P.*, 763 F. Supp. 2d 832, 857 (S.D. Tex. 2011) (failure to give performance evaluation not ultimate employment decision); *Hollimon v. Potter*, 365 F. App'x 546, 549 (5th Cir. 2010) (failure to train not an ultimate employment decision); *Mitchell v. Snow*, 326 F. App'x 852, 853–54 (5th Cir. 2009)) (failure to give performance review not ultimate employment action).  The ultimate employment decisions at issue are not the denials of training or performance reviews, but the decisions that these events led to, such as the denial of a raise or promotion.

NOV's motions are granted as to the discrimination claims based on an employment action that is not an ultimate employment decision.  These claims are dismissed insofar as they are asserted as separate grounds for relief or recovery.  These allegations are not eliminated altogether, however, and may be presented as supporting allegations for claims based on what are ultimate employment actions.

16

### C.    Time-Barred Claims

NOV argues that the § 1981 claims asserted by Heard and Rose are time-barred.  (Docket Entry No. 20, at 7; Docket Entry No. 24, at 6).  A four-year statute of limitations applies to violations of § 1981 that arise after an employment contract begins, including claims for harassment, wrongful termination, or any other postcontract conduct of the employer.  *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004).

Heard alleged that he applied for and was denied a receiving position in 2006, and a shipping position sometime before May 2008. (Docket Entry No. 3, ¶¶ 78–79).  Heard alleged that he was required to perform the duties of both of these positions without a corresponding change in pay or job title.  These alleged incidents all occurred in or around 2006, more than four years before Heard filed suit on May 1, 2012.  The allegations about working out-of-class or denial of promotion cannot support Heard's claims under §1981, and all such claims based solely on conduct occurring more than four years before May 1, 2012, must be dismissed.

Rose asserted that he was confronted by an employee wearing Confederate flag suspenders shortly after he began working at NOV in 1977.  (Docket Entry No. 3, ¶¶ 86–87).  The job termination and rehire in 2005 and the use of the word "nigger" in 2007 allegedly occurred more than four years before Rose filed suit.  (*Id.*, ¶¶ 89–90).  These allegations cannot support Rose's claims under § 1981.  The claims for relief based solely on conduct occurring more than four years before May 1, 2012 must be dismissed.

The plaintiffs argue that the continuing-violation doctrine applies.  This argument is unpersuasive.  "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S.

101, 113–14 (2002).  "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.  Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"  *Id.* at 114.  "[O]nly incidents that [take] place within the timely filing period are actionable."  *Id.*  Heard alleges he applied for a receiving position in 2006 and a shipping position on an unspecified date, and that both positions went to non–African-American employees.  (Docket Entry No. 3, ¶¶ 78–79).  Rose contends that his job was terminated in 2005 as part of a workplace-relocation process and that less qualified non–African-American employees were allowed to transfer rather than losing their jobs.  (*Id.*, ¶ 89).  The continuing-violations doctrine does not apply to these discrete incidents.

The plaintiffs do not appear to contest this point or argue that ultimate employment decisions that are untimely cannot be the basis for relief.  Rather, citing instances of racial slurs and similar harassment, they argue that allegations that predate May 1, 2008 support either hostile work environment claims or are relevant background evidence for timely claims.  (Docket Entry No. 33, at 33–34).  NOV has not moved to dismiss the hostile work environment claims.  And the untimely allegations discussed above may provide background evidence for timely claims.  *See, e.g.*, *Cortes v. Maxus Exploration Co.*, 977 F.2d 195, 199–200 (5th Cir. 1992).  The plaintiffs may rely on pre–May 2008 allegations to support timely hostile work environment claims or to provide background for other timely claims.

## IV.    Conclusion

NOV's motions for partial dismissal are granted.  The following chart illustrates the claims that have been dismissed and the claims that remain as to each plaintiff:

| Plaintiff | Claims Dismissed | Claims Not Dismissed |
|---|---|---|
| All Plaintiffs | Claims based on non-ultimate-employment decisions to the extent asserted as separate grounds for relief or recovery | Claims that properly present such allegations as support for claims that are based on ultimate employment decisions |
| All Plaintiffs | Retaliation | |
| Junious Vital | Discrimination based on:<br>• wrongful suspension;<br>• constructive discharge; or<br>• failure to provide written performance reviews | Discrimination based on:<br>• termination of employment;<br>• wrongful discipline;<br>• failure to train;<br>• failure to provide educational benefits;<br>• denial of raises;<br>• failure to promote;<br>• working out of class |
| Damon Darby | Discrimination based on:<br>• termination of employment;<br>• wrongful suspension;<br>• failure to train;<br>• wrongful discipline;<br>• constructive discharge;<br>• failure to provide written performance reviews;<br>• failure to provide educational benefits; or<br>• working out of class | Discrimination based on:<br>• denial of raises;<br>• failure to promote |
| David Lane | Discrimination based on:<br>• wrongful suspension;<br>• constructive discharge;<br>• failure to provide written performance reviews; or<br>• working out of class | Discrimination based on:<br>• termination of employment;<br>• failure to train;<br>• failure to provide educational benefits;<br>• denial of promotions;<br>• wrongful discipline;<br>• unequal pay |

| Herbert Heard | (1) Discrimination based on:<br>• wrongful suspension;<br>• failure to train;<br>• constructive discharge;<br>• unequal pay;<br>• failure to provide written performance reviews; or<br>• failure to provide educational benefits<br>(2) Discrimination under 42 U.S.C. § 1981 to the extent independently based on conduct occurring more than 4 years before May 1, 2012 | Discrimination based on:<br>• termination of employment;<br>• denial of raises;<br>• failure to promote;<br>• wrongful discipline |
| --- | --- | --- |
| Billy Rose | (1) Discrimination based on:<br>• termination of employment;<br>• wrongful suspension;<br>• failure to train;<br>• constructive discharge;<br>• failure to provide educational benefits; or<br>• working out of class<br>(2) Discrimination under 42 U.S.C. § 1981 to the extent independently based on conduct occurring more than 4 years before May 1, 2012 | Discrimination based on:<br>• denial of raises;<br>• denial of promotion;<br>• wrongful discipline<br>• failure to provide written performance reviews |
| Jerome Johnson | Discrimination based on:<br>• wrongful termination;<br>• wrongful suspension;<br>• failure to train;<br>• unequal pay;<br>• failure to provide written performance reviews;<br>• failure to provide educational benefits; or<br>• working out of class | Discrimination based on:<br>• constructive discharge;<br>• denial of raises;<br>• denial of promotion |

| Edward Jiles | Discrimination based on:<br>• wrongful suspension;<br>• failure to train;<br>• wrongful discipline;<br>• constructive discharge;<br>• unequal pay;<br>• failure to provide educational benefits; or<br>• working out of class | Discrimination based on:<br>• termination of employment;<br>• failure to promote;<br>• failure to provide written performance reviews |
| --- | --- | --- |
| DeWarren Bellard | Discrimination based on:<br>• wrongful suspension;<br>• failure to train;<br>• unequal pay;<br>• constructive discharge;<br>• failure to provide written performance reviews;<br>• failure to provide educational benefits; or<br>• working out of class | Discrimination based on:<br>• termination of employment;<br>• denial of promotions;<br>• wrongful discipline |

The dismissals are without prejudice and with leave to amend.  The plaintiffs may file an amended complaint no later than **May 24, 2013**.

SIGNED on May 3, 2013, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

21