**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JUNIOUS VITAL, *et al*., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-12-1357 |
| | § | |
| NATIONAL OILWELL VARCO, *et al*., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

The plaintiffs in this employment-discrimination lawsuit are Junious Vital, Damon Darby, Herbert Heard, Billy Rose, Jerome Johnson, Edward Jiles, DaWarren Bellard[1], and David Lane. All are African-American past or present employees of the defendant, National Oilwell Varco, L.P. ("NOV"). The plaintiffs assert claims under Title VII; 42 U.S.C § 1981; and the Texas Commission on Human Rights Act, Texas Labor Code § 21.051 (TCHRA). This court previously dismissed some of the plaintiffs' claims without prejudice and with leave to amend, and the plaintiffs filed an amended complaint. (Docket Entries Nos. 57, 60). NOV then moved to strike some claims and to dismiss others. (Docket Entry No. 63). While that motion was pending, NOV moved for summary judgment. (Docket Entry No. 78). The court denied the motion to strike and dismiss, explaining that the issues they raised would be addressed together with the motion for summary judgment. (Docket Entry No. 85).

---

[1] The parties spell Bellard's first name as either "DeWarren" or "DaWarren." (*Compare* Docket Entry No. 78-1 at 14 *with* Docket Entry No. 80 at 16). Bellard spells his first name "DaWarren." *(* Docket Entry No. 78-7 at 60).

Based on the pleadings, the motions and responses, the parties' submissions, the record, and the relevant law, this court grants in part and denies in part NOV's motion for summary judgment and, to the extent some claims are challenged only in the motion to dismiss or strike, grants that motion in part and denies it in part.  The remaining claims are:

| Vital | Discrimination based on:<br>  - Failure to provide educational benefits<br>  - Working out of class<br>Hostile work environment |
|---|---|
| **Darby** | Hostile work environment |
| **Lane** | Discrimination based on:<br>  - Termination<br>  - Failure to provide educational benefits<br>Hostile work environment |
| **Heard** | Discrimination based on:<br>  - Failure to provide educational benefits<br>Hostile work environment |
| **Rose** | Hostile work environment |
| **Johnson** | Discrimination based on:<br>  - Constructive discharge<br>Hostile work environment<br>Retaliation based on:<br>  - Wrongful discipline |
| **Jiles** | Discrimination based on:<br>  - Suspension<br>Hostile work environment |
| **Bellard** | Discrimination based on:<br>  - Suspension<br>Hostile work environment |

A status conference is set for **October 28, 2014**, at 5:00 p.m.  The reasons for the rulings are explained in detail below.

## I.    Background

NOV is an oilfield services company with multiple divisions. The plaintiffs worked in NOV's Downhole Tools (DHT) or Mission Valve Products (Mission Valve) divisions, both located at NOV's West Gulf Bank Road facility in Houston, Texas. (Docket Entry No. 78-1 at 2). DHT and Mission Valve have separate corporate structures and human resources departments, but apply the same antiharassment policy. (Beverly Affidavit at 1). The plaintiffs allege that they experienced discrimination, retaliation, and harassment because they are African-American. The plaintiffs claim that they frequently heard racial slurs and epithets from NOV coworkers and supervisors and saw racist graffiti in the workplace. (Docket Entry Nos. 60; 81). Each plaintiff's claims are summarized below.

### A.        Junious Vital

Vital began working at DHT in May 2008 as a shop hand making $13.00 per hour. (Vital Depo. at 78). He testified that he was supposed to receive a $1.00 per hour raise after a 90-day probationary period. (*Id*.). Vital received a "merit increase" of $1.00 per hour in December 2008. (Beverly Affidavit at Ex. 3).

Vital claims that he was required to work 12 to 14 hours per day. (Docket Entry No. 60 at 2). He complained to his supervisor, Kenneth Fallar, that his long hours made him physically ill and that he was treated unfairly compared to his white coworkers. (Docket Entry No. 60 at 3). Vital alleges that Fallar threatened to write him up if he did not work the hours assigned. (*Id*.). Vital claims that his non-African-American coworkers worked fewer hours than he did and left him alone in the facility, in violation of NOV's policies. (Docket Entry No. 60 at 3).

Vital received informal training on NOV's machines from Dimas Martinez. Vital alleges that Martinez recommended him for promotion, but that Fallar and his manager, Jeff Barby, refused.

(*Id.*).  Vital also alleges that his managers rejected his requests for additional training.  (*Id.* at 4).

Vital claims that although he performed the job duties of a lead man, he was never given that title.

Vital claims that he trained many non-African-American employees who were promoted when Vital

was not.  (*Id.*).

Vital testified that a coworker named Gustavo[2] used the word "nigger" in Vital's presence.

(Vital Depo. at 115).  When Vital told Gustavo that he found the word offensive, Gustavo replied

"Well, that's just the way we talk around here, dude.  So you — that's just something you going to

have to learn to deal with."  (*Id.* at 115).  Vital reported the incident to Shawn Lemen,[3] one of his

supervisors.  (*Id.* at 115–16).  Vital does not know if Gustavo was disciplined.  (*Id.* at 116).

Vital witnessed another African-American employee, Calvin Wright, crying after a coworker

called him a "nigger."  (*Id.* at 201).[4]  Wright is not a party to this suit.  Vital did not witness the

incident.  (*Id.* at 21).  Vital testified that the person who called Wright the name received a three-day

suspension after Wright reported the incident to human resources.  (*Id.* at 202).

Vital testified that he heard the words "nigger," "gorilla," and "coonass," directed at or

referring to African-Americans, on a "day-to-day basis" at NOV.  (*Id.*).  His coworkers, including

David Jasso, used the word daily;  "acting manager" Simon Eduardo used the word "pretty often";

and his manager, Dave Evans, used the word at least once.  (*Id.* at 202–08).  Vital testified that his

---

[2]  "Gustavo" is the only name for this individual in the record.

[3]  Lemen's name is spelled in the pleadings as "Leeman," "Lehman," and "Lemen."  In his deposition, he spelled his name "Lemen."  (Docket Entry No. 78, Ex. 25, Deposition of Shawn Lemen.).

[4]  NOV objects to portions of Vital's testimony about Wright as hearsay.  (Docket Entry No. 89-1 at 16).  The deposition testimony is within the present sense impression exception to the hearsay rule.  *See* Fed. R. Evid. 803(1) ("A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it.").  The objection is overruled.

supervisor, Lemen, witnessed at least one of these incidents, and Vital reported other incidents to Lemen.  (*Id.* at 205–06).

Vital testified that on one occasion, his hand was stuck in a "basket grapple" machine.  (*Id.* at 209).  Jasso took a picture of Vital's hand and distributed it during a safety meeting, saying, "Your big-ass hands wouldn't have gotten stuck in that basket grapple if you wouldn't have had them big-ass nigger hands."  (*Id.* at 209–10).  Vital reported this incident to Evans but not to Human Resources.  (*Id.* at 210).  On another occasion, Jasso distributed copies of a photograph of Vital's head superimposed on a gorilla's body during a safety meeting, saying, "Look at Big Jue as an African monkey."  (*Id.* at 188–89, Ex. 12).  Some laughed and passed the photograph around.  (*Id.* at 188–89).  After the meeting, Vital complained to Evans, who was present.  Evans responded, "Oh, man, learn how to take a joke.  It's just a joke.  It's no big deal."  (*Id.*).  Vital testified that when he told a human resources representative about his experiences, she responded, "Okay, Junious, just hang in there[,]" but she took no action.  (*Id.* at 266).

Vital testified that "Dave Evans, Steven, Gustavo, Simon, Mike Beasley, . . . Shawn Lemen . . . George Fernando, [and] David Jasso" would whistle to get his attention instead of using his name or paging him over the intercom.  (*Id.* at 215–16).  Vital was offended by this behavior and felt it was "racially derogatory" because non-African-American coworkers were summoned by name.  (*Id.*).

Vital received multiple write-ups for leaving work early.  (Docket Entry No. 60 at 3).  Vital was also disciplined six times for pulling the wrong parts, and once for using his phone when he was supposed to be working.  (Vital Depo. at 58, 60–61, 64, 67, 122–24, 167-69, 175; Exs. 3–6, 10, 11; Docket Entry No. 60 at 5).

5

On April 7, 2011, Vital's mother became ill and he took a Family and Medical Leave Act leave of absence.  (*Id.* at 229–31).  Before taking his leave, Vital requested a transfer to the night shift, but his request was denied.  (Vital Depo. at 233).  On July 7, 2011, human resources representative Samantha Slack sent Vital a letter stating that his FMLA leave of absence had expired and giving Vital two weeks to return to work or lose his job.  (Slack Depo. at Ex. 48).  Vital did not return to work.  (Vital Depo. at 261–62).  Slack testified that even if Vital had returned in the two-week period, he would have been terminated for "repeated shipping errors that the customer reported since his leave."  (Slack Depo. 251–52).  On July 21, 2011, Vital was fired for not returning from his leave of absence.  (Evans Depo. at Ex. 8).

**B.      Damon Darby**

NOV hired Darby in October 2009 as a Shipping/Receiving Materials Handler at $14.00 per hour.  (Darby Depo. at Ex. 2).  Darby reported to Lemen.

Darby received a written warning on January 17, 2011 for being "tardy on 8/2, 8/9, 10/13, 10/14 and 1/10."  (*Id*. at Ex. 7).  Darby did not sign the document.  (*Id.* at 71).  Darby was also disciplined because he lifted over 50 pounds, in violation of a safety rule.  Darby believed that non-African-American employees, including "Carlos,"[5] were not disciplined for violating the same rule. (*Id.* at 71–74).  Darby requested a raise on three occasions, from Omar Barajas, Simon Guajardo, and a warehouse manager, toward the end of 2011, and was refused each time.  (*Id*. at 205–08). Darby testified that Eric Ayalla and James Sanchez, who are not African-American, told him that they received raises during that time.  (*Id.*).  Darby had not received a raise when he left in March

---

[5]  Darby stated that he could not recall Carlos's last name.

2012.  (*Id.* at 207).  After learning this, Darby complained to Barajas that he was being treated differently.

Darby also claims that he asked for a different position on multiple occasions.  He specifically requested a job on the "Mission side," in the "cage," and in the assembly department.  (*Id.* at 225–29; Docket Entry No. 60 at 3).  Darby testified that two men who were not African-American were hired in the assembly department over him, and a Hispanic man named Isaac[6] was given the job in the "cage." (Darby Depo. at 187–88, 225–27).  Darby does not know if the job on the "Mission side" was filled.  (*Id.* at 229).

Darby testified that he frequently experienced racial harassment.  He was at the meeting when the picture of Vital's head on a gorilla's body was circulated.  (*Id.* at 154).  He did not report the incident to managers Evans, Guajardo, or Tammy Hurl because they were also present when it occurred.  (*Id.* at 235).

His coworkers told him that "'if you had a nigger doll, imagine what we'd have to do with a nigger doll, put grease in her hair, get you a straightening comb.'" (*Id.* at 154).  Darby responded, "'Wow, y'all are saying this when I'm here . . . Imagine what y'all say when I'm not here." (*Id.*). In the presence of Darby and a supervisor, a coworker said that an employee named Obede was good at soccer because he was from Africa and was used to "kicking monkeys and catching coconuts." (*Id.* at 155).  Darby testified that David Sanchez, a coworker, yelled, "Come here, nigger. Come here, nigger. Fuck you nigger," to an employee who had been terminated and was being escorted off the premises.  (*Id.* at 178).  Sanchez reported that someone who did not work in the building

---

[6]  Darby stated that he could not recall Isaac's last name.

asked the supervisor, "'Y'all let y'alls employees talk to each other like that?" (*Id.*). Darby testified that Sanchez was not disciplined:

> The next day, Dave Sanchez, who said, "Come here, nigger," came to me personally, was like, "Damon, today might be my last day. I said 'Come here, nigger,' and they took it out of context, but they want to see me." He goes in. He comes out five minutes later, smiling. "Its good. I'm cool."

(*Id.* at 154). Darby also witnessed Jasso mocking Vital after his hand got stuck in a machine, showing a photo and saying that Vital had "big nigger hands. That's why this happened." (*Id.* at 167–68). Darby testified that Evans, Barajas, and Guajardo were also present when Jasso mocked Vital and "chuckled." (*Id.* at 168). Darby explained that Jasso "never called me a nigger, but he said nigger around me a lot." (*Id* at 197–98). Darby summarized his NOV experience by stating: "I've never felt so uncomfortable in my life, never in my life. The word 'nigger,' it was redundant, more common than cigarette smoke. You heard it everyday, all day, from guys that wasn't black." (*Id.* at 157).

Darby testified that he felt he could not report the discrimination, harassment, and retaliation he experienced because he heard that NOV had retaliated against coplaintiff DaWarren Bellard after he reported Jasso for making inappropriate comments. (*Id*. at 105–106, 196).

Darby left NOV in March 2012 to take a position with a different company.

## C.     David Lane

NOV hired Lane in October 2008 as a Quality Control Inspector, at an hourly rate of $24.00. (David Lane Depo. at 169). Lane's brother, Allen, also worked for NOV but is not a party to this suit. (*Id.* at 107–08). Lane's supervisor was John Bidinger. (*Id.* at 125). Bidinger called Lane "blackie," "boy," "peon," "squirrel," and "bubba." (*Id.* at 163, 18; 78–12 at 27). Lane testified that

he objected when Bidinger used the word "nigger" during a meeting.  Bidinger responded, "Oh, shut up.  I ain't racist.  I hate everybody."  (*Id*. at 197–98).  Lane testified that Bidinger called him "blackie" in front of human resources manager, Terry Ivy, third-party vendors, and coworkers.  (*Id*. at 321–23).  Ivy denied that he ever heard Bidinger call Lane "blackie," "bubba," or "squirrel." (Ivy Depo. at 39–40).  Lane testified that Bidinger also called him "nigger" during a meeting.  (David Lane Depo. at 299).

When Lane worked the day shift, he heard people say "nigger" so often in the lunchroom that he began to eat his lunch at his desk.  (*Id.* at 100–179; *see* 80-1 at 5).[7]  Lane told Ivy about the lunchroom situation and Bidinger's treatment of him.  (*Id.* at 178–83, 324).  Ivy denied that Lane reported hearing racial slurs from Bidinger or anyone else.  (Ivy Depo. at 40).

Lane testified that he saw frequently saw the word "nigger," pictures of monkeys, and the phrase "go eat a banana" on the bathroom walls.  (David Lane Affidavit at 2–3; David Lane Depo. at 304–06; Docket Entry No. 80–1 at 5–6).  Lane reported the graffiti to Ivy.  (*Id*.).  Lane testified that a higher-level manager, Jamie Anacona, was aware of the graffiti and took pictures of it to show to Human Resources, (David Lane Depo. at 279–284,David Lane Affidavit at 3), bu tDavid and Allen Lane clocked out at exactly the same time at the end of the day.

---

[7] NOV objects to portions of Lane's declaration on the ground that it contradicts testimony he gave in his deposition.  (Docket Entry No. 89-1 at 17–18).  If an affidavit is inconsistent with prior deposition testimony without sufficient explanation, a court may disregard the affidavit.  In his declaration, Lane stated that he did not know the names of some of the employees who used the word "nigger" frequently in the lunchroom because they worked in a different division.  (David Lane Affidavit at 2).  In his deposition, Lane testified that the divisions took lunch breaks at different start and end times.  (David Lane Depo. at 101, 294).  NOV argues that this shows that Lane did not take lunch with the other division and could not have heard someone in that division use the word "nigger" at lunch.  NOV asserts that Lane has not accounted for the contradiction and the declaration should be excluded.  (Docket Entry No. 89–1 at 17–18).  The deposition is not irreconcilable with the declaration because the divisions could have different start and end times but nonetheless overlap.

On August 24, 2011, NOV fired both David and Allen Lane. (Ivy Depo. at 132). The stated reasons were that David Lane had left work early without clocking out, and Allen Lane had clocked himself and David out. (*Id*. at 132, Ex. 15). The circumstances were that David Lane's boots were put up for the day. Ivy saw him in his truck in the parking lot at lunch, but did not see him return. No worker saw David Lane at work that afternoon, (*Id*. at Exs. 2, 15). NOV believed that Allen had clocked his brother out for him. (*Id*.). Lane disputes the circumstances of his termination. He argues that he was at work after his lunch break, that he had a second pair of boots, that he parked in a different lot than the one Ivy was watching, that no one tried to contact him by phone during the work day, and that he had clocked himself out. (David Lane Depo. at 417–18, 424–28).

### D.   Herbert Heard

NOV hired Heard as a temporary employee in 2007 and made him a permanent employee in 2008. (Heard Depo. at 83, Ex. 4). Heard initially worked at a different location, but transferred to the West Gulf Bank facility in 2008. (Beverly Affidavit at 1). Heard received four written disciplinary notices during his employment. (Heard Depo. at Exs. 7–10). Barajas, one of Heard's supervisors, rated his performance as average. (Barajas Depo. at 163).

Heard testified that he saw racial graffiti — including the phrase "F these niggers"— at work. (Heard Depo. at 43). He reported the graffiti to Manager Lemen, Evans, and Randy Vital, as well as other employees. (*Id*.). Heard was present at the meeting when Jasso passed around the picture of Vital's head superimposed on a gorilla's body. (*Id.* at 249). Heard testified that he saw a coworker with pictures of hanged men drawn on his clipboard, and another employee with a drawing of a noose. (*Id.* at 44, 252).

10

Heard testified that Jasso called him a "nigger" "probably about six, seven times a day." (*Id.* at 228–29). Heard testified that Lemen and Evans heard Jasso use the epithet. (*Id.* at 229–30).

Heard also testified that Evans called him a "nigger" twice. (*Id.* at 230–33). The second incident was in the context of Evans issuing a written disciplinary warning to Heard for standing near the time clock five minutes before the end of his shift. (*Id.* at 234, Ex. 10). Heard testified: "I started crying. And I needed my job. I couldn't say nothing back to him. He made me cry. He called me a nigger." (*Id.* at 231). Barajas was also present during th einteraction, but did not intervene. (*Id.* at 232).

Heard reported the incident to his coworkers, but not to a supervisor or to human resources. (*Id.*).

On July 3, 2011, a third-party vendor reported that he saw an employee try to break into the West Gulf Bank facility. (Slack Depo. at Ex. 21). The vendor identified Heard as the person he saw. (Engel Depo. at Ex. 4). Heard denied any attempt to break into the facility, but admitted that he was in the area at the time, waiting for a ride. (Heard Depo. at 208–11). After an investigation, Heard was fired on July 21, 2011 for "Gross Misconduct." (Slack Depo. at Ex. 1; Engel Depo. at Ex. 4). Barajas, who did the paperwork for Heard's termination, testified that he did not agree with the decision to fire Heard, but implemented it because Lara Isaacs directed him to. (Barajas Depo. at 162–163). Human Resources employee Samantha Slack also disagreed with the decision to fire Heard. (Slack Depo. at 28). Larry Engel and Daniel Alman, two NOV managers, supported the decision. (Engel Depo. at Ex. 4).[8]

---

[8] NOV argues that Engel and Alman "terminated Heard's employment." (Docket Entry No. 78-1 at 15). Barajas prepared the paperwork, which did not refer to either Engel nor Alman. (Docket Entry No. 78-20 at 11). Engel testified that he "would have approved" the decision. (Docket Entry No. 78-5 at 10).

### E.      Billy Rose

Billy Rose began working for an NOV predecessor in 1977.  (Docket Entry No. 80 at 13).
Rose was laid off in 2005.[9]  Rose was later rehired as a temporary worker in January 2006 at NOV's
Air Center facility, and transferred to the West Gulf Bank facility in 2008.  (Rose Depo. at 48–51).
Rose testified that he saw racial graffiti and heard racial slurs at the Air Center facility, which he
reported to his supervisor.  (*Id.* at 106–109).

Rose frequently heard people use the word "nigger" in the break room, which made him stop
eating lunch there.  (*Id.* at 109, 183).  He testified that Barajas was present on some occasions when
the word was used.  Rose testified that he heard Sanchez shout "'mother-fucking nigger'" to an
African-American named Chris, who had been fired,  (*Id.* at 223–27).  Rose testified that either
Guajardo or Barajas was present when that happened.  (*Id.*).  Rose was present when Jasso circulated
the picture of Vital's head on the body of a gorilla.  (*Id.* at 231).  Rose testified that a coworker, Ed
McCullough, would frequently refer to him as "boy."  (*Id.* at 206–10).  Rose told Evans about
McCullough's behavior, but McCullough's behavior did not change.  (*Id.*).

Rose received a five percent raise in March 2011.  (*Id.* 139–45, Exs. 8, 9).  Another employee
in the same department, Michael Beasley, received a nine percent raise at roughly the same time.
(*Id.*).  Beasley is not African-American and has a different job title than Rose.  *(Id.*).  Rose is still
working at NOV.

### F.      Jerome Johnson

NOV hired Jerome Johnson in 2010.  (Docket Entry No. 80 at 9).  Johnson initially worked in
the shipping department, and transferred to the receiving department in late 2010.  (Johnson Depo.

---

[9]  Rose has not challenged this termination in this suit.  (Docket Entry No. 60).

at 121–22).  Johnson testified that Evans made comments about an African-American coworker's hair.  (*Id.* at 125–27) ("What's wrong with Ulissea's hair?")).  Johnson felt that the comments were racially motivated.  (*Id.*).  Johnson testified that this occurred more than once.  He spoke to regional manager Chris Little about the comments.  (*Id.* at 124, 127–28).  Johnson testified that after he talked to Little, his workload increased: "I started getting more work, more tasks and a lot more emails start coming — coming toward me as far as: Why this and why — why this hasn't been shipped.  I need you to go look for this — this product."  (*Id.* at 124, 128–29).  Johnson testified that he e-mailed Pam Jiles to complain that he and Ulissea Price were being treated unfairly because of their race.  (*Id.* at 137–39).  That e-mail is not in the record.

On January 14, 2011, Evans gave Johnson a written "Final Warning" for failing to send a shipment to Algeria that had been "processed systematically in September and October."  (*Id.* at Ex. 9).  The Final Warning stated that product should be "shipped out same day or the following day."  (*Id.*).  Evans wrote on the Final Warning that he and Johnson "also discussed the lack of response to e-mails over the past 3 months."  (*Id.*).  Johnson disputed that the facts were as Evans described, asserting that he properly prepared and sent the shipment.  (Docket Entry No. 80 at 10).

In response to the Final Warning, Johnson sent Pam Jiles an e-mail on January 17, 2011.  The subject line stated "Hostile Environment," and complained that the Final Warning was not preceded by a first or second warning, in violation of NOV's progressive discipline policies.  (*Id.*; Johnson Depo. at Ex. 8).  Johnson also complained that he had not received proper training from his supervisor, Tammy Hurl, and that Hurl had "an attitude."  (*Id.* at 136–37, Ex. 8).  Pam Jiles forwarded the e-mail to Slack, who investigated the Algerian shipment and interviewed Johnson. (*Id.* at 154; Slack Depo. at 204).  Johnson testified that Slack's "only main concern was [the Algeria

order]." (Johnson Depo. at 154). Slack was able to find the Algeria shipment. The Final Warning was reduced to a second warning. (Slack Depo. at 204).

Johnson also testified that he told Lemen "that Dave Evans was racist," and that African-Americans were treated unfairly in the receiving department. (Johnson Depo. at 130). Lemen disagreed but said he would talk to Evans. (*Id.*). Lemen moved Johnson to the receiving department one week after their conversation. (Johnson Depo. at 133–34, 145).

Johnson testified that Guajardo, his supervisor in the receiving department, called him "boy" in front of Evans and asked him about his "nappy hair." (*Id.* at 176, 180–83). Guajardo denied that he called Johnson "boy" or made a comment about "nappy hair." (Guajardo Depo. at 48, 58). Johnson testified that Guajardo and his manager, Barajas, assigned all of the African-American employees outside work, while all of the non-African-American employees worked inside. (Johnson Depo. at 174, 179). Johnson testified that he heard Jasso use the word "nigger" "[o]n a daily basis." (*Id.* at 201–02). Johnson complained about Jasso to Lemen, but Jasso still used the word after that. (*Id.* at 203). Johnson asked Jasso to stop, with no effect. (*Id.* at 203, 212). Johnson was present when Jasso circulated copies of the photograph showing Vital's head on a gorilla's body and stated that Evans and Hurl laughed about the photo. (*Id.* at 205–06). Johnson also complained to Lemen about racist graffiti in the bathrooms. (*Id.* at 117–18, 208–11, 226–27).

Johnson asserted that he applied for a promotion to Field Tech but did not get the job. Johnson also asked both Barajas and Guajardo for a raise, without success, but an employee named Eric,[10] who was not African-American, did receive a raise during this period. (Docket Entry No. 60 at 32).

---

[10]   "Eric" is the only name given for this individual in the record.

Johnson quit his job at NOV in February 2012 in response to these incidents and to what he felt was a "racially hostile work environment."  (*Id.* at 216).

## G.        Edward Jiles

Edward Jiles began working for NOV in 2010 as a materials handler.  (Jiles Depo. at 41, 44–48; Docket Entry No. 60 at 34).   Jiles claims that he was supposed to receive a raise and performance review after a 90-day probationary period. (Jiles Depo. at 63–64).  Jiles asked Lemen for the raise and the performance review, but never received it.  (*Id.* at 64–65).  Jiles claimed that he asked for a raise in summer of 2011, but that Barajas again denied the request.  (Docket Entry No. 60 at 37). Jiles applied for "four or five" promotions, but was "summarily denied" each time.  (*Id.*).   Jiles claimed that the promotions were given to less-qualified employees who were not African-American.  He specifically points to "Anthony" as a comparator.[11]  (*Id.* 38; Jiles Depo. at 117–18).

Jiles testified that he heard Jasso use the word "nigger" "[a]ll the time" and that his supervisor, Guajardo, used racist language on a weekly basis.  (Jiles Depo. at 125–30).  Jiles also testified that he did not report Jasso to the human resources department because Jasso's mother worked at NOV and because no one at human resources answered the phone when he called.  (*Id.* at 133–34).

In September 2011, Barajas criticized Jiles for poor work performance, telling him: "go home and don't come buck until I tell you to."  (*Id.* at 116).  Jiles complained to human resources, which told him to return to work the next day.  (*Id.* at 118–19).  Jiles testified that when he returned, he and Barajas had a confrontation "in front of everybody" about his work performance.  (*Id.*).  Jiles claims that Barajas called him a "nigger" under his breath, (*id.* at 119–20); Barajas denied it, (Barajas Depo.

---

[11]  "Anthony" is the only name given for this individual in the record.

at 128).  Jiles testified that he called human resources and left a message about the incident, but no one returned it.  (Jiles Depo. at 120).

Jiles developed a workplace injury from lifting heavy loads.  (*Id*. at 159).  Jiles reported the injury to Barajas, who assigned him "light duty."  (*Id*. at 163–65).  Jiles saw a doctor, who prescribed medication that made him drowsy.  (*Id*. at 164–65).  Jiles fell asleep at work at least once. (*Id*.).  NOV's safety coordinator told Jiles that he should not work while taking the pills and suggested he go back to his doctor to get a different medicine.  (Jiles Depo. at 166–167, 174).  Jiles's doctor kept him on the same medicine, so Jiles did not immediately return to work.  (*Id*. at 167, 175). Guajardo told Jiles to call in every day that he would be unable to work due to his medication.  (*Id*. at 167, 174–79).  Jiles testified that he called in every day for a week and a half, when Guajardo asked him to come in for a meeting.  (*Id*. at 179).  At that meeting, Jiles received separate written warnings for not coming in to work on March 12, 23, 24, and 25, and was fired.  (Guajardo Depo. at 59–62; Jiles Depo. at 69–84).  Guajardo testified that Jiles was fired because he lied about having a doctor's appointment in order to avoid work.  (Guajardo Depo. at 59–60).  Jiles's written termination notice states that he was fired for "fraudulent behavior, attendance and poor performance."  (Guarjardo Depo. at Ex. 3).

## H.    DaWarren Bellard

DaWarren Bellard began working for NOV in 2005 as a "helper."  (Docket Entry No. 60 at 39). He was promoted to an "order puller" in 2006, and transferred to the West Gulf Bank Facility in 2009.  (Bellard Depo. at 107, 114).  In 2011, Bellard applied for a "lead" position.  (Docket Entry No. 60 at 39).  Bellard alleged that the job went to a less-qualified employee who was not African-American.  (*Id*.).  Bellard testified that Jasso called him a "black monkey," and used the word

"nigger" around him.  (Bellard Depo. at 197–205).  Bellard testified that he avoided the break room

and ate lunch in his car so he would not have to hear the word.  (Bellard Depo. at 201–03).  Bellard

talked to Pam Jiles and Lemen about Jasso's comments, but did not hear back from them.  (*Id.* at

197–98; 205–07).  On one occasion, Jasso unplugged Bellard's lift, and another employee had to

help him get down.  (Vital Depo. at 289–90).

Bellard was present when Jasso passed around the picture of Vital's head on a gorilla's body.

(*Id.* at 247–50).  Bellard testified that he saw racist graffiti in the bathrooms, including the words

"I hate all niggers."  (*Id.* at 226–28).

Bellard received multiple disciplinary notices for pulling the wrong parts.  (*Id*. at Exs. 2, 3, 5,

7–9).  Bellard claimed that these notices "were unjustified as they either lacked any basis in fact or

reflected de minimus violations, which when committed by non African Americans were not the

subject of discipline."  (Docket Entry No. 60 at 41).  The last notice was in March 2011.  (Bellard

Depo. at Ex. 9).

Bellard went on medical leave beginning in May 2011 due to heart problems.  (Bellard Depo.

at 130, 182–83; Slack Depo. at 75–77).  His leave was approved for up to one year.  (Slack Depo.

at 77).  During his leave, Barajas contacted Slack to find out when Bellard would return.  (Slack

Depo. at 79–80, Ex. 9).  Barajas thought that Bellard was supposed to return after two weeks, and

"to complicate matters more, he [was] due a final write up which [would] lead to termination."

(Slack Depo. at 180, Ex. 9).  Evans asked Slack whether Bellard could be terminated while on leave.

(Evans Depo. at 166; Slack Depo. at 80–88).  When Bellard returned on June 14, 2011, he was fired

for poor performance.  (Bellard Depo. at 183, 186).  Evans made the decision to fire Bellard.  (*Id*.

at 96–98).

## II.   The Applicable Legal Standards

### A.        A Motion to Dismiss

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. 544).  The Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555).

When a plaintiff's complaint fails to state a claim, a district court generally should provide the plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice.  *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("district courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case"); *see also United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion." (internal citation omitted)).  "Denial of leave to amend may be warranted for undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies, undue prejudice

18

to the opposing party, or futility of a proposed amendment." *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 270 (5th Cir. 2010) (emphasis added).  A district court has broad discretion to dismiss a complaint without leave to amend "where the plaintiff has previously been granted leave to amend [to cure pleading deficiencies] and has subsequently failed to add the requisite particularity to its claims." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009); *see also Carroll v. Fort James Corp.*, 470 F.3d 1171, 1175 (5th Cir. 2006) (affirming a district court's dismissal for failure to state a claim without leave to amend after the court "instructed [the plaintiffs] to plead their fraud claim with greater particularity, but the amended complaint was still woefully inadequate").

**B.      A Motion to Strike**

"The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  FED. R. CIV. P. 12(f).  The decision to grant a motion to strike is within the court's discretion.  *Jacobs v. Tapscott*, 2004 WL 2921806, at *2 (N.D. Tex. Dec. 16, 2004), *aff'd on other grounds*, 277 Fed. App'x. 483 (5th Cir. 2008).  When, as here, the motion to strike is based on the presence of "redundant" and "immaterial" matter, courts are particularly reluctant to grant it.  "Both because striking a portion of a pleading is a drastic remedy, and because it is often sought by the movant simply as a dilatory tactic, motions under Rule 12(f) are viewed with disfavor and are infrequently granted."  *Id.* (citing *FDIC v. Niblo*, 821 F. Supp. 441, 449 (N.D. Tex. 1993); *SEC v. Cuban*, 798 F. Supp. 2d 783, 787 (N.D. Tex. 2011).  "The purpose of this rule is to streamline the pleadings and the litigation and to avoid unnecessary inquiry into immaterial matters."  *McInerney v. Moyer Lumber & Hardware, Inc.*, 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002).  Immateriality is established by showing the challenged allegations "can have no possible bearing

upon the subject matter of the litigation." *Sadler v. Benson Motors Corp.*, 1997 WL 266735, at *1 (E.D. La. 1997) (quoting *Succession of Wardlaw v. Whitney Nat'l Bank*, 1994 WL 479183, at *1 (E.D. La. 1994)).   Striking certain allegations can be appropriate when they "have no possible relation to the controversy and may cause prejudice to one of the parties." *McInerney*, 244 F. Supp. 2d at 402; *see also Berry v. Lee*, 428 F. Supp. 2d 546, 563 (N.D. Tex. 2006); *Boreri v. Fiat S.P.A.*, 763 F.2d 17, 23 (1st Cir. 1985).

## C.        A Motion for Summary Judgment

This case involves eight plaintiffs, and nine separate claims for relief.  Many of the claims for relief allege several discrete instances of actionable conduct.  Some of these claims are incorporated by reference into another claim because the plaintiffs seek relief under Title VII, 42 U.S.C. § 1981, and TCHRA.  (Docket Entry No. 60 at 1).  As an example, Vital's first claim for relief alleges the following eleven instances of discrimination: "Termination of employment; Constructive discharge; Wrongful discipline; Failure to provide training; Failure to provide educational benefits; Denial of raises; Failure to promote; Working out of class; and Denial of employment."  Vital's fourth claim under § 1981 and his seventh under Texas Labor Code § 21.051 directly incorporate the allegations of his Title VII claim.  (Docket Entry No. 60 at 49, 53).  The Title VII, § 1981, and TCHRA claims are analyzed under the same standard.  *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403–04 n.2 (5th Cir. 1999).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . ."  Fed. R. Civ. P. 56(c)(1)(A).

"[T]he plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact." *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172 (5th Cir. 2012) (citing *Celotex*, 477 U.S. at 323). If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine dispute of material fact, it does not need to negate the elements of the nonmovant's case. *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010).

"A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." *Duffie*, 600 F.3d at 371 (internal quotation marks omitted).

"When the moving party has met its Rule 56[] burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Id.* The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Id.* (internal quotation marks omitted). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions,

or by only a scintilla of evidence.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir.

2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).  "In

deciding a summary judgment motion, the court draws all reasonable inferences in the light most

favorable to the nonmoving party." *Duffie*, 600 F.3d at 371.

### D.        A Claim for Discrimination and Retaliation

The Fifth Circuit analyzes § 1981 claims and TCHRA claims under the same standard as

claims under Title VII.  *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 356 (5th Cir. 2005); *Turner*

*v. Kansas City S. Ry. Co.*, 675 F.3d 887, 891 (5th Cir. 2012), as revised (June 22, 2012) (citing

*Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 311 (5th Cir. 1999); *See also*

*Flanagan v. Aaron E. Henry Cmty. Health Servs. Ctr.*, 876 F.2d 1231, 1233–34 (5th Cir. 1989).

Intentional discrimination can be proven by either direct or circumstantial evidence.  *Russell v.*

*McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000).  Evidence is direct if it would prove

the fact in question without inference or presumption. *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d

409, 415 (5th Cir. 2003) (citations omitted).  If no direct evidence exists, the court uses the familiar

burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), to

determine whether summary judgment is appropriate.  *See Davis v. Dallas Area Rapid Transit*, 383

F.3d 309, 316 (5th Cir. 2004).  The legal standard is well settled:

> To survive summary judgment under *McDonnell Douglas*, the
> plaintiff must first present evidence of a prima facie case of
> discrimination.   If the plaintiff presents a prima facie case,
> discrimination is presumed, and the burden shifts to the employer to
> articulate a legitimate, nondiscriminatory reason for the underlying
> employment action.   If the employer is able to state a legitimate
> rationale for its employment action, the inference of discrimination
> disappears and the plaintiff must present evidence that the employer's
> proffered reason was mere pretext for racial discrimination.

*Davis*, 383 F.3d at 317 (citations omitted).

The elements of a *prima facie* showing of discrimination are that the plaintiff: (1) is a member of a protected class; (2) was qualified for the position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class or, in the case of disparate treatment, was treated more harshly than others who were similarly situated.  *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001).

The defendant's burden of articulating a legitimate, nondiscriminatory reason for its adverse employment action is a burden of production, not persuasion.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (5th Cir. 1993).  The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 507 (internal citations and quotation marks omitted).  The defendant must produce "admissible evidence, . . . which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action."  *Id.* at 507.

If the employer meets its burden, the *prima facie* case dissolves, and the burden shifts back to the plaintiff to raise a fact dispute material to determining either: (1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another "motivating factor" is the plaintiff's protected characteristic.  *Vaughn*, 665 F.3d at 636 (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)); *see also Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) ("On summary judgment . . . the plaintiff must substantiate his claim of pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision.").  (citations omitted). "Once a Title VII [§ 1981, or TCHRA] case reaches the pretext stage, the only question on summary

23

judgment is whether there is a conflict in substantial evidence to create a jury question regarding discrimination." *Shackelford*, 190 F.3d at 404.

In the employment context, the relevant actions are those of the decisionmakers. *See, e.g., Gee v. Principi*, 289 F.3d 342, 346 (5th Cir. 2002). But the case law recognizes that a decisionmaker may be influenced by others who are racially biased. The "cat's paw" theory of liability requires evidence that a coworker or supervisor exhibited animus and "possessed leverage, or exerted influence, over the titular decision maker." *Robertson v. Alltel Info. Serv.*, 373 F.3d 647, 653 (5th Cir. 2004). If the decisionmaker conducted an independent investigation and did not merely rubber stamp or rely on the recommendation of another, the causal link between the alleged animus and the adverse employment action is broken. *Mato v. Baldauf*, 267 F.3d 444, 450 (5th Cir. 2001).

### E.     A Hostile Work Environment Claim

#### 1.     Hostile Work Environment

Title VII and § 1981 claims for a hostile work environment are analyzed under the same standard. *Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1284 n.7 (5th Cir. 1994); *Shackelford*, 190 F.3d at 404 n.2. The elements of a hostile work environment claim are that: (1) the plaintiff belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on membership in the protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known of the harassment, yet failed to take prompt remedial action. *Felton v. Polles*, 315 F.3d 470, 484 (5th Cir. 2002). The individual plaintiffs have the burden to prove all five elements for each plaintiff's claims in order to make a *prima facie* showing. When a plaintiff alleges that he was harassed by supervisors with immediate or successively higher authority over him, he must satisfy

24

only the first four elements. *See Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353–54 (5th Cir. 2001).  If the plaintiffs make a *prima facie* showing of supervisor harassment, NOV may avoid vicarious liability for its employees' harassing behavior through the *Faragher* defense.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, at 806–08 (1998).  "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 807.

For harassment to affect a term, condition, or privilege of employment, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) (internal quotation marks and citation omitted); *see also Watkins v. Texas Dept. of Crim. Justice*, 269 F. App'x 457, 463–464 (5th Cir. 2008) (per curiam) (unpublished).  The Supreme Court has explained that courts must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Harris*, 510 U.S. at 23.  *Compare Tademy v. Union Pacific Corp.*, 614 F.3d 1132 (10th Cir. 2008) (finding a fact issue on hostile work environment based on evidence of various graffiti and cartoons combined with the words "nigger," "nigger go home," and "hang all niggers and jews" etched on the employee's locker and a noose hanging in the workplace), *with Baker v. FedEx Ground Package Sys., Inc.*, 278 Fed. App'x 322, 329 (5th Cir. 2008) (supervisor's comments to African-American employee that "she did not want to work with people like" the plaintiff employee and that "whites rule" were not sufficiently severe

to survive summary judgment on a race-based hostile work environment claim); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337 (5th Cir. 2007) (holding that a supervisor's infrequent and isolated comments directed to the plaintiff about "ghetto children" and other racially insensitive remarks did not create a fact issue as to whether there was severe or pervasive harassment); *Septimus v. Univ. of Houston*, 399 F.3d 601, 612 (5th Cir. 2005) (holding that one two-hour "harangue" by a supervisor and use of a mocking tone on one occasion, and another supervisor's comment comparing the plaintiff to a "needy old girlfriend," did not amount to a severe or pervasive working environment); *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 653 (8th Cir. 2003) (finding occasional racial comments insufficient for a hostile work environment claim).

"To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so."  *Harvill v. Westward Comm. LLC*, 433 F.3d 428, 434 (5th Cir.2005) (quoting *Shepherd v. Comptroller of Pub. Accts.*, 168 F.3d 871, 874 (5th Cir. 1999)) (quotation marks omitted).  The legal standard requires proof of severe or pervasive conduct that can be characterized as "extreme."  *Faragher*, 524 U.S. at 788 (1998).  The Supreme Court has repeatedly stated that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).  In this case, the frequent and pervasive nature of racist comments must be considered alongside evidence that the plaintiffs did not report many of the allegedly harassing incidents to NOV, that NOV's responses were not always satisfactory, and that the plaintiffs were frequently able to perform their jobs without difficulty.

### III.    The Motion to Dismiss or Strike

The claims addressed are those NOV moved to dismiss or strike but did not also seek summary judgment.

#### A.    Junious Vital

NOV moves to strike Vital's race-discrimination claims for "Wrongful discipline; Failure to provide training; Failure to provide educational benefits; . . . [and] Working out of class," on the ground that this court previously dismissed them.  (Docket Entry No. 63-1 at 6) (modifications in original).

This court did not previously dismiss Vital's claims for requiring him to work out of class or for failing to provide him educational benefits.  (Docket Entry No. 57 at 19).  NOV does not advance a separate argument for dismissing these two claims.  NOV argues only that these claims should be dismissed because they were dismissed before.  The motion to dismiss these claims is denied.  Vital's discrimination claims for having to work out of class and for failure to provide educational benefits survive.

In the table the court provided in its previous memorandum and order, Vital's claims for discriminatory discipline and failure to provide training were erroneously placed in the "claims not dismissed" column.  (Docket Entry No. 57 at 19).  But the court's earlier memorandum and order clearly dismissed these claims because they are not the type of employment actions that support a claim for Title VII discrimination.  (*Id.* at 15–16) (citing opinions holding that "disciplinary filings" and "denials of training" are insufficient to sustain a discrimination claim).  Vital's claims for discriminatory discipline and failure to train are dismissed.

NOV also moves to dismiss Vital's claims for constructive discharge. (Docket Entry No. 63-1 at 7). The court previously dismissed these claims, without prejudice. (Docket Entry No. 57 at 19). A constructive-discharge claim requires a plaintiff to show that he resigned in response to working conditions that were so difficult or unpleasant that a reasonable person in his shoes would have felt compelled to resign. *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998); *Laudgrat v. USI Film Prods.*, 968 F.2d 427, 429 (5th Cir. 1992). Involuntary termination is not required. *See Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004); *see also  Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994) ("[A] plaintiff must show, as part of his prima facie case, that he was discharged. When an employee resigns . . . he may satisfy the discharge requirement by proving constructive discharge.").

NOV argues that Vital did not plead sufficient facts to support a constructive-discharge claim. (Docket Entry No. 63-1 at 7). In response, Vital argues that the allegations in paragraphs 40-42 of his amended complaint support this claim. (Docket Entry No. 64 at 7). While it is true that those paragraphs in the amended complaint are superficially different from the corresponding allegations in the Original Complaint that the court found to be deficient, they still fail to allege facts that will support a claim for constructive discharge. Vital alleges that "although NOV did not explicitly state to [him] that his employment was involuntarily terminated, by its actions Defendant communicated to Plaintiff that he had in fact been discharged from employment." (Docket Entry No. 60 at 10). Vital states that he was "ready and willing to work." (*Id.*). Vital has not alleged facts that plausibly claim constructive discharge because he claims that he was *actually* discharged, and he was ready and willing to work. The court dismisses Vital's constructive-discharge claims.

NOV also seeks dismissal of Vital's discrimination claim based on "denial of raises." (Docket Entry No. 63-1 at 7).  NOV also moved for summary judgment on this claim, and it is addressed in that context.

### B.    Damon Darby

NOV moves to dismiss only one of Darby's claims, for retaliation based on the denial of a raise.  (Docket Entry No. 63-1 at 7).  NOV also moved for summary judgment on this claim, and it is discussed in that context.

### C.    David Lane

NOV moves to strike Lane's discrimination claims for failure to train, failure to provide educational benefits, and wrongful discipline on the ground that the court previously dismissed those claims.  (Docket Entry No. 63-1 at 8).  As noted, the prior opinion erroneously included the claims of failure to train and wrongful discipline in the table of claims not dismissed, despite the fact that the body of the court's memorandum and order clearly dismissed these claims because they did not allege actionable adverse employment actions.  (Docket Entry No. 57 at 16).  Lane's claims for discriminatory discipline and failure to train are stricken.

The court did not previously dismiss Lane's claim for failure to provide educational benefits. (Docket Entry No. 57 at 19).  Lane's discrimination clam for the failure to provide education benefits survives.

### D.    Herbert Heard

NOV moves to strike Heard's claims for discrimination based on "Failure to train; Failure to provide educational benefits; . . . Wrongful discipline" on the ground that they are not "ultimate employment actions."  (Docket Entry No. 63-1 at 8) (ellipsis in original).  The court's table at the

29

close of its last memorandum and order included "wrongful discipline," "failure to train," in the "claims not dismissed" column, despite the fact that the written analysis clearly disallowed this claim.  Docket Entry No. 57 at 16, 20).  The discriminatory discipline and failure to train claims Heard alleged did not amount to "ultimate employment" actions.  These claims were previously dismissed.  Heard's claims for discrimination for failure to train and wrongful discipline are stricken. His claim for failure to provide educational benefits remains.

### E.      Billy Rose

NOV moves to strike Rose's discrimination claims for wrongful discipline and failure to provide written performance reviews.  (Docket Entry No. 63-1 at 9).  The court previously dismissed these claims because Rose did not allege facts showing the discipline and lack of written performance reviews were actionable employment actions.  (Docket Entry No. 57 at 20).  Rose's claims of discriminatory discipline and failure to provide written performance reviews are stricken.

### F.      Jerome Johnson

NOV moves to strike Johnson's claim of discriminatory discipline on the ground that this court had previously dismissed this claim.  (Docket Entry No. 63-1 at 9).  Johnson included this claim in his original complaint.  (Docket Entry No. 3 at 35–36).  The court did not place this claim in either the claims dismissed or the claims not dismissed column in the prior memorandum and order.  (Docket Entry No. 57 at 20).  The opinion itself clearly dismissed this claim.  (*Id*. at 16). Johnson's discriminatory discipline claim is stricken.

### G.      Edward Jiles

NOV moves to strike Jiles's claim for discriminatory failure to provide written performance reviews on the ground that it was previously dismissed.  (Docket Entry No. 63-1 at 9-10).  The

court's table erroneously placed this claim in the "claims not dismissed" column. (Docket Entry No. 57 at 21). The court's memorandum and order, however, did dismiss this claim. (Docket Entry No. 57 at 16). Jiles's discrimination claim for failure to provide written performance reviews is stricken.

NOV also moves to dismiss Jiles's claim of retaliatory suspension and termination of employment. (Docket Entry No. 63-1 at 10). NOV also moved for summary judgment on these retaliation claims, and they are discussed in that context.

### E.    DaWarren Bellard

NOV moves to strike Bellard's clam of discriminatory discipline on the ground that it was previously dismissed. (Docket Entry No. 63-1 at 11). It was, because Bellard did not plead facts showing that the discipline he received was an actionable adverse employment action. Bellard's discriminatory discipline claim is stricken.

NOV also moves to dismiss Bellard's discrimination and retaliation claims for suspension, on the grounds that the court "previously dismissed [those claims] because of the lack of any allegations to support such claims." (*Id.*). The court had previously dismissed both claims. (Docket Entry No. 57 at 19, 21). Bellard has amended to add allegations about his suspension. (Docket Entry No. 60 at 41-42). The allegations state claims for discriminatory and retaliatory suspension may proceed. NOV's motion to dismiss those claims is denied.

## IV.    Summary Judgment

### A.    Discrimination Claims

#### 1.    Junious Vital

##### a.    Termination and Denial of Employment

31

Vital claims NOV fired him and refused to hire him back because he is African-American. NOV contends that Vital was fired because he did not return to work after his FMLA leave expired, and that Vital never reapplied for a job.

Vital went on FMLA leave starting on April 7, 2011.  (Docket Entry No. 60 at 10).  His request for FMLA leave listed his return date as "unknown."  (Vital Depo. at Ex. 13).  Vital claims that NOV gave him permission to remain on FMLA leave through July 31, 2011.  (Docket Entry No. 60 at 10).  NOV asserts that Vital's FMLA leave expired on June 30, 2011.  (Docket Entry No. 78-1 at 8; Slack Depo. at 243, 250–51, Ex. 18).  It is undisputed that on July 7, 2011, NOV told Vital that his FMLA leave had expired and that his employment was terminated, but gave Vital a two-week "grace period" to return to work.  NOV told Vital that if he did not return within two weeks, his employment would be terminated effective July 21, 2011.  (Slack Depo. at Ex. 18).  Vital claims that he was willing to return to work, but that his manager would not allow him to, in some fashion not explained.  (Docket Entry No. 60 at 10; 67 at 3–4).  Vital claims that because his manager did not allow him to return to work, NOV fired or constructively discharged him.  (Docket Entry No. 60 at 10–11).  He also claims that NOV denied him employment because they refused to hire him back. (*Id*.).  But in his deposition, Vital admitted that he never made arrangements to return to work at NOV while on FMLA leave, did not return to work before July 21, 2011, and did not reapply for employment.  (Vital Depo. at 261–62).  There is no evidence that when he was given the deadline for returning to work, he raised the issue that he as not "allowed" to return to work.

Vital claims that Evans's use of the word "nigger" in the months before Vital was fired is direct evidence of discrimination.  (Docket Entry No. 64 at 12–13).  To serve as direct evidence of an employer's discriminatory intent, a workplace comment must be "direct and unambiguous,

32

allowing a reasonable jury to conclude without any inferences or presumptions that [race] was an impermissible factor in the decision to terminate the employee."  *See EEOC v. Texas Instruments Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996).  In *Jones v. Overnite Transp. Co.*, 212 Fed. App'x 268, 273 (5th Cir. 2006), the court held that racially biased comments were not direct evidence of discrimination.  The plaintiff, a dock worker at a transportation company, allegedly overheard a supervisor state that he wanted to "get rid of all the blacks" and "fire a bunch of niggers."  *Id.*  The plaintiff's employment was terminated a few months after these comments.  *Id.*  The court held that although these comments revealed the supervisor's discriminatory animus, they "lack[ed] the indicia of specificity and causation required to be direct evidence of race discrimination."  *Id.*  The court also considered evidence that the same supervisor had requested a staffing agency to send white drivers instead of black drivers.  *Id.*  The court held that this statement was not direct evidence of discrimination because it did not relate to the plaintiff's former employment as a dock worker and required the trier of fact to infer a nexus between the statement and plaintiff's termination.  *Id.*; *see also Haas v. ADVO Sys., Inc.*, 168 F.3d 732, 733 (5th Cir. 1999) (holding that a job interviewer's statement that the plaintiff's age caused him "concern" was not direct evidence of age discrimination in the employer's decision not to hire plaintiff because an additional inference of discrimination was required).

By contrast, in *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987 (5th Cir. 2005), the court found racially biased comments to be direct evidence of discrimination.  In that case, an African-American applicant was not hired for the position of casino poker dealer.  Several witnesses testified that the decisionmakers were "using race as a factor in employment decisions."  *Id.* at 993.  The decisionmakers made comments to witnesses that "these good old white boys don't want black

people touching their cards," and "maybe I've been told not to hire too many blacks in the poker room." *Id.* at 990–91. Because these race-based comments related directly to the challenged hiring decisions, the court concluded that the comments were direct evidence of discrimination. *Id.*; *see also Cross v. FPP Operating Partners*, 2001 WL 1143159, at *7 (N.D. Tex. Sep. 25, 2001) (supervisor's comment to white subordinate employees that "no fucking niggers were going to work in her store, especially niggers from Electra" was direct evidence of discrimination); *Bowe v. Exide Corp.*, 2001 WL 705881, at *3 n. 1 (N.D. Tex. June 18, 2001) ("[Direct] evidence typically involves statements made by the employer or certain of its personnel that indicate that an employment decision was based on a forbidden factor."). The comments Vital relies on fall short of those in *Robinson*. Although Evans's use of the word "nigger" was clearly offensive and racially charged, it does not speak directly to employer efforts to take actions on account of race. A judge or jury would have to "infer a nexus" to reach the conclusion that any actions taken against Vital were racially motivated. *See Overnite Transport.*, 212 Fed. App'x at 273.

With no direct evidence of discriminatory intent, the analysis moves to the *McDonnell Douglas* burden-shifting framework. The first step is Vital's *prima facie* case. It is undisputed that Vital is a member of a protected class, was qualified for his job, and that NOV's decisions to fire and not rehire him were adverse employment actions. The question is whether Vital can show that other similarly situated employees who are not African-American were treated differently under nearly identical circumstances. "For employees to be similarly situated those employees' circumstances, including their misconduct, must have been nearly identical." *Perez v. Texas Dep't of Crim. Justice, Institutional Div.*, 395 F.3d 206, 213 (5th Cir. 2004) (internal quote omitted). Vital has not identified any non-African-American employee who failed to return to work after the

expiration of FMLA leave and was not fired.  Because he cannot show that similarly situated employees were treated more favorably under nearly identical circumstances, he has not made a *prima facie* showing of discrimination.

Even if Vital had made a *prima facie* showing of discriminatory termination, he has not raised a fact dispute material to deciding whether NOV's legitimate nondiscriminatory reasons for firing him — Vital's failure to return after the expiration of his leave and despite a warning — and for not hiring him back — Vital's failure to reapply — were pretextual, or that race was a motivating factor.  Vital does not dispute that NOV informed him that his FMLA leave had expired, that NOV gave him an extra two weeks to return to work, and that he did not return to work during that period or reapply for a job afterwards.  NOV is entitled to summary judgment on Vital's discriminatory termination claims.

### b.    Failure to Promote

Vital claims that NOV denied his promotion requests because of race discimination.  He asserts that he performed the role of a lead man without the title or the corresponding pay, trained employees who went on to become his managers, and was not allowed to work in the machine shop although he finished the training required to do so.  (Docket Entry No. 60 at 3, 4, 7).  NOV moved for summary judgment on Vital's failure to promote claim, arguing that Vital did not seek a promotion, but rather a lateral transfer.  (Docket Entry No. 78 at 15).

A *prima facie* showing of a discriminatory failure to promote requires a plaintiff to show that "(1) he belongs to a protected class; (2) he applied for and was qualified for a position for which applicants were being sought; (3) he was rejected; and (4) a person outside of his protected class was hired for the position." *Burrell*, 482 F.3d at 412 (citing *Medina*, 238 F.3d at 680–81).  Failure to

apply for a disputed promotion bars a "failure to promote" claim absent a showing that applying would have been futile.  *Shackelford*, 190 F.3d at 406; *see also Grice v. FMC Techs. Inc.*, 216 Fed. App'x 401, 406 (5th Cir. 2007) (*per curiam*) (finding no prima facie showing of "failure to promote" where the employee failed to apply for the promotion at issue).  "Where the evidence produces no objective showing of a loss in compensation, duties, or benefits, but rather solely establishes that a plaintiff was [not] transferred [to] a prestigious and desirable position . . . that evidence is insufficient to establish an adverse employment action." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) (citing *Serna v. City of San Antonio*, 244 F.3d 479, 485 (5th Cir. 2001)).  An employee's "subjective opinion about the greater prestige" of a desired position does not show that it was a promotion, absent an "objective difference in the employment benefits garnered from the assignment." *Griffin v. Sea Mar Mgmt., Inc.*, 243 F. App'x 852, 854 (5th Cir. 2007).  Employment benefits include "compensation, duties, or benefits." *Id.*

Vital sought a position in the machine shop.  (Vital Depo. at 221).  Vital has not alleged or pointed to evidence showing that this position was better paid, had different benefits, or had significantly different job duties than his position.  Darby's deposition testimony that "NOV don't do like promotions unless you're going from a regular worker to a supervisor," and that anything else was a "lateral move" supports NOV's contention that the job in the machine shop was a transfer. (Darby Depo. at 188).  Vital has not met his burden of showing that the position he applied for was a promotion.  "An employer's refusal to grant a purely lateral transfer does not constitute an adverse employment decision actionable as intentional racial discrimination." *Griffin*, 243 F. App'x at 854 (citing *Burger v. Cent. Apt. Mgmt.,* 168 F.3d 875, 879 (5th Cir. 1999)).  Summary judgment is granted on Vital's failure to promote claims.

36

###### c.        Working Out of Class and Failure to Provide Educational Benefits

Vital claims that NOV discriminated against him by forcing him to work out of class and by refusing to provide him the same education benefits given to non-African-American employees. NOV's motion to dismiss this claim was denied.  NOV has not moved for summary judgment on these claims.

###### d.        Denial of Raises

Vital claims that NOV discriminated against him by denying him raises.  In his first amended complaint, Vital did not allege that he ever asked for a raise or was denied one.  NOV addressed this claim in both its motion to dismiss and its motion for summary judgment.  (Docket Entry Nos. 63-1 at 7; 78-1 at 12).

NOV argues that Vital has not alleged facts that show either that he asked for a raise or that a raise was denied.  (Docket Entry No. 63-1 at 7).  NOV presented evidence that Vital received a $1.00 per hour merit raise on December 7, 2008 (Beverly Affidavit, at 2, Ex. 4).  Vital did not respond to NOV's motion for summary judgment on this claim, or point to evidence to support his claim.  (Docket Entry No. 80).

Vital testified that he was supposed to receive a $1.00 per hour raise after 90 days at NOV, and that was supposed to be eligible for a $1.00 per hour raise every quarter.  (Vital Depo. at 45). Vital was unaware whether other employees had received a raise after a probationary period.  (*Id.* at 46).

Vital has not pled, or pointed to evidence that would show whether similarly situated non-African-American employees had received raises.  Vital has not made a *prima facie* showing of discriminatory denial of raises.  Summary judgment is granted on his denial of raises claim.

### 2.     Damon Darby

#### a.     Denial of Raises

Darby claims that NOV discriminated against him by refusing to give him raises that were awarded to non-African-American employees.  To make a *prima facie* showing of discrimination, Darby must also show that similarly situated employees who were not African-American received raises during the same period.  *See Hart v. Life Care Ctr. of Plano*, 243 F. App'x 816 (5th Cir. 2007).  In his deposition, Darby stated that two non-African-American material handlers, Eric Ayalla and James Sanchez, told him that they had received raises.  (Darby Depo. at 107–08).  NOV objected to this evidence as inadmissible hearsay.  (Docket Entry No. 78-1 at 13).  "Evidence on summary judgment may be considered to the extent not based on hearsay or other information excludable at trial."  *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995); *see also Okoye v. Univ. of Texas Houston Health Sci. Ctr.*, 245 F.3d 507, 510 (5th Cir. 2001).  Darby's recounting of what Ayalla and Sanchez told him is inadmissible hearsay and cannot raise a factual dispute as to whether other non-African-American employees received raises.  Darby also claims that he was supposed to receive a pay raise after "about six months," but he does not offer any evidence that the alleged policy applied to similarly situated non-African-American employees.  (Darby Depo. at 53, 204).  Darby has not made a *prima facie* showing of discriminatory denial of raises.  Summary judgment is granted on his denial of raises claim.

#### b.     Failure to Promote

Darby claims that NOV discriminated against him by refusing to give him the positions he requested in the "cage," the assembly department, and the Shipping and Receiving Department of

Mission.  (Docket Entry No. 60 at 11–13).  NOV moved for summary judgment, arguing that the positions Darby wanted were lateral transfers, not promotions.  (Docket Entry No. 78-1 at 15–16).

In his deposition, Darby admitted that the positions he sought were not promotions.  (Darby Depo. at 78–79, 186–88, 224–26).  Darby testified that NOV only considered moves to supervisory positions as promotions, and that pay levels were determined independently of job titles.  (*Id.* at 186–88).  The response to NOV's motion for summary judgment confirms  that the cage position "did not involve a pay increase, but was a lateral move."  (Docket Entry No.  80 at 9).  Darby has not made a *prima facie* showing of discriminatory failure to promote.  Summary judgment is granted on this claim.

### 3.   David Lane

#### a.   Termination

Lane claims that NOV discriminated against him by firing him.  (Docket Entry No. 60 at paras. 61, 75, 98–100, 181).  NOV moved for summary judgment, arguing that Lane was fired for leaving without properly clocking out and "stealing time" from NOV.  (Docket Entry No. 78 at 34; Ivy Depo. at 135–36; Lane Depo. at Ex. 5).

In discriminatory-discharge cases based on an employee's alleged violation of a "work rule," a plaintiff "may establish a *prima facie* case by showing 'either that he did not violate the rule or that, if he did, white employees who engaged in similar acts were not punished similarly.'" *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995) (quoting *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980)).  Lane claims that he did not violate the work rule.

NOV presented evidence that he had received reports that Lane was leaving work early and having his brother, Allen Lane, clock him out.  (Ivy Depo. at 46).  Terry Ivy investigated.  Ivy

testified that he saw David Lane in his car at the NOV parking lot at noon on August 15, 2011. When Ivy returned at 12:30 p.m., he did not see Lane or his truck.  Ivy testified that he watched the lot until 1:00 p.m. but did not see Lane return.  Ivy walked through Lane's work place but was unable to find him.  Ivy saw Lane's work boots on the shelf, suggesting that he had stopped working for the day.  (Ivy Depo at Ex. 2).  Both Lanes were "clocked out" "exactly at 4:25 pm." (*Id.*).  Ivy told Bidinger to investigate further.  Bidinger talked to Greg Southerland on August 15, 2011, and spoke to both David and Allen Lane the next day.  (Southerland Depo at 91–93; Ivy Depo. at 82–89).  Bidinger's investigation confirmed Ivy's conclusion that David Lane had left at noon on August 15, 2011, and that Allen Lane had clocked both himself and David out when he left at 4:25 p.m.  David Lane testified that he left work at noon to switch cars with his wife then returned to work until 4:25 p.m.  (David Lane Depo. at 427–31).  He testified that he had a second pair of work boots and these were the boots Ivy saw on the shelf.  He also testified that he worked in a different location than where Ivy was looking for him.  (*Id.* at 417, 428–32).  Lane also claims that Ivy was not really looking for him because he told Allen Lane that he did not need help.  (Allen Lane Depo. at 143).  Allen Lane testified that his brother worked the entire day.  (*Id.* at 147–53).  This evidence suffices for a *prima facie* showing.

"Simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext."  *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007); *see also Mire v. Texas Plumbing Supply Co., Inc.*, 286 Fed. Appx. 138, 143–44 (5th Cir. 2008) (unpublished) (per curiam) (holding that the plaintiff's subjective belief that she was right and defendant was wrong, without more, was insufficient to rebut defendant's reasons for the disciplinary action); *Bryant v. Compass Group USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (stating

that the fact that an employer's investigation reaches the wrong conclusion does not show an improper motivation); *Cervantez v. KMGP Services Co. Inc.*, No. 08–11196, 349 Fed.Appx. 4, 10–11, Slip Op. at 8–9, 2009 WL 2957297 (5th Cir. Sep. 16, 2009) (unpublished) (per curiam) ("[A] fired employee's actual innocence of his employer's proffered accusation is irrelevant as long as the employer reasonably believed it and acted in good faith.").

The summary-judgment evidence shows that NOV investigated and that Ivy, Bidinger, and Southerland concluded that Lane had falsified his timecard. The record does not create a fact dispute as to whether NOV terminated Lane's employment with the intention to discriminate against him because he was African-American. The record shows that Lane was replaced by another African-American man. (Bidinger Depo. at 143).

Lane attempts to show pretext under a cat's paw theory, arguing that "Bidinger played a major role" in his termination and that Bidinger exhibited "racial animus." (Docket Entry No. 80 at 53). NOV responds that vice-president of human resources, Jack Peoples, or the human resources director, Otto Hallberg, made the decision to fire Lane, and that Bidinger was not involved. (Docket Entry No. 86-2 at 9). The summary judgment evidence shows that Bidinger was involved in the investigation and reported his conclusion to the decisionmakers. (Ivy Depo. at 129–30). Although Bidinger testified that he did not know that Lane would be disciplined as a result of the investigation and that the decision to fire him "was out of [his] hands," (Bidinger Depo. at 111, 114; Docket Entry No. 83 at 74–75), it is undisputed that Ivy asked Bidinger to investigate. *See Staub v. Proctor Hospital,* ——U.S. ——, 131 S.Ct. 1186, 1193 (2011) (stating that an "employer is at fault [when] one of its agents committed an action based on discriminatory animus that was intended to cause,

and did in fact cause, an adverse employment action."). Because there is a fact dispute as to pretext or motivating factor, summary judgment on Lane's termination claim is denied.

### b.     Failure to promote

Lane claims that NOV discriminated against him by denying his requests for a promotion. Lane alleges that Southerland, who is white, was promoted to the lead inspector position, and that Southerland was less qualified than Lane.  The summary judgment evidence shows that Lane was on the "same level" as Southerland during their overlapping employment at NOV.  Southerland was promoted only after Lane was fired.  (Lane Depo. at 131–32, 168; Docket Entry No. 60 at 14).  The record shows that Allen Lane, who is African-American, was the lead inspector when David Lane worked at NOV.  (*Id.*).  Neither David Lane nor Southerland was promoted to the lead inspector position during Lane's employment at NOV.  Lane has not made a *prima facie* showing of discriminatory failure to promote, or raised a fact dispute as to pretext or motivating factor. Summary judgment is granted on this claim.

### c.     Unequal Pay

Lane claims that NOV discriminated against him by paying him less than his non-African-American coworkers.  He alleges that he did not receive the cost of living adjustment increase that non-African-American coworkers received.  Lane specifically points to Greg Southerland as a comparator.  (Docket Entry No. 60 at 19–20).  NOV moved for summary judgment, contending that Lane was actually paid more than Southerland.

A *prima facie* showing of discriminatory compensation requires a plaintiff to show "(1) that [he is] a member of a protected class and (2) that [he is] paid less than a nonmember for work requiring substantially the same responsibility."  *Williams v. Galveston Indep. Sch. Dist.*, 78 F.

42

App'x 946, 949 (5th Cir. 2003) (quoting *Uviedo v. Steves Sash & Door Co.,* 738 F.2d 1425, 1431 (5th Cir.1984); *see also Pittman v. Hattiesburg Mun. Separate Sch. Dist.,* 644 F.2d 1071, 1074 (5th Cir. Unit A May 1981)).

The summary judgment evidence shows that in December 2010, Lane was paid $25.20 per hour and Southerland was paid $21.00 per hour.  (Southerland Depo. at 27, 60–61; Lane Depo. at 171).  Lane testified that no one in his department received a raise from October 2008 to December 2010, when he received a five percent raise.  (Lane Depo. at 160, 173).  Lane did not respond to NOV's motion for summary judgment on this claim or point to any evidence that he was paid less than non-African-American employees at any time during his employment at NOV.  There is no factual dispute material to determining whether Lane was paid less than his non-African-American counterparts.  Summary judgment is granted on Lane's unequal pay claims.

### d.   Failure to Provide Educational Benefits

Lane alleges that NOV discriminated against him by refusing to provide him the same education benefits given to non-African-American employees.  NOV's motion to dismiss this claim was denied, and NOV has not moved for summary judgment on this claim.

### 4.   Herbert Heard

### a.   Termination

Heard alleges that NOV fired him because of his race.  (Docket Entry No. 60 at 25, 27, 43).  NOV moved for summary judgment, arguing that Heard was fired because of his multiple incidents of misconduct, culminating in a vendor's report that Heard was seen trying to break into NOV facilities.  (Docket Entry No. 78-1 at 20–21).

NOV contends that it had a reasonable basis to conclude that Heard repeatedly violated workplace rules and that he cannot show that non-African-American employees were treated less harshly when they broke the same rules.

Heard admitted that he caused damage to a pallet of parts worth $8,000.00 while trying to "put [the] parts high in the air." He was written up for the incident. (Heard Depo. at 175–179, Ex. 9). Heard also admitted that he was written up on multiple other occasions for poor performance and for attempting to clock out early after recently attending training that told employees not to do so. (Heard Depo. at 39–40,175–96 at 3-4, 12-16). Heard disputes only the report that he broke into an NOV building and points out that nothing was stolen from that building. Heard argues that this reason was a pretext for discriminating because neither Slack and Heard's manager, Barajas, thought that there was enough evidence to fire Heard just for the alleged break-in. (Engel Depo. at 79; Slack Depo. at 142–43, Exs. 22, 26, 28). His argument ignores his extensive disciplinary history before the report of the break-in.

Summary judgment evidence showing that NOV investigated the vendor's report about Heard and had a good-faith belief that he had broken into the building as described. NOV talked to other witnesses who were at the building at the time and looked at whether Heard was clocked in at the time. (Slack Depo. at Exs. 21–22; Isaacs Depo. at 66-67). Slack opposed the termination, believing that there was not enough evidence to tie Heard to the break-in. (Slack Depo. at Exs. 21–22). But Slack was not the decisionmaker, and Heard has pointed to no evidence suggesting that Daniel Alman and Larry Engel, who decided to fire Heard, did not reasonably believe that Heard had broken into the building. "Simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext." *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383,

391 (5th Cir. 2007); *Bryant v. Compass Group USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (the fact that an employer's investigation reaches the wrong conclusion does not show an improper motivation).

Heard also argues that NOV's explanation for his termination was pretextual under a cat's-paw theory of liability.  Heard argues that Evans, his supervisor, told him that he "should feel lucky to have a job"; that Evans "had a history of using racially derogatory epithets;" and that Evans "participated in the decision to terminate Heard's employment."  (Docket Entry No. 80 at 52).  The summary-judgment evidence shows that Alman and Engel made the decision to fire Heard and that Barajas processed the paperwork.  (Barajas Depo at 160–61; Isaacs Depo. at 62–63).  Heard has pointed to no evidence raising an inference that Evans intended to influence the investigation or had any role in the termination decision.

Heard claims that David Jasso, who held the same position as Heard and was not African-American, was treated more favorably than he was because Jasso "engaged in numerous, repeated acts of horseplay in the workplace with no apparent discipline."  (Docket Entry No. 80 at 45).  Heard alleges he was fired after a single allegation.  (*Id*. at 54).  But Heard had received multiple write-ups and was accused of breaking into a building, and Jasso did not have a disciplinary history and was not suspected in a break-in.   "For employees to be similarly situated those employees' circumstances, including their misconduct, must have been nearly identical."  *Perez*, 395 F.3d at 213 (internal quote omitted).  Jasso's different treatment occurred in different conditions.  Summary judgment is granted on Heard's discriminatory-termination claim.

### b.      Failure to Promote

Heard alleged that NOV discriminated against him by failing to promote him to a position in assembly.  NOV contends that this was a lateral transfer, not a promotion.  (Docket Entry No. 78-1 at 17).  The summary judgment evidence supports NOV's contention.  Heard admitted in his deposition that the position he sought was a "transfer" and not a promotion.  (Heard Depo. at 220).  Summary judgment is granted on Heard's claim for failure to promote.

### c.      Unequal Pay

Heard alleged that NOV discriminated against him by paying him less than non-African-American employees.  (Docket Entry No. 60 at 25–26, 43, 182).  NOV moved for summary judgment on this claim.  (Docket Entry No. 78-1 at 13).  In his deposition, Heard testified that three Hispanic employees told him that they were paid more than he was.  (Docket Entry No. 78–9 at 9).  Heard offers no evidence other than hearsay statements in support of his unequal pay claim.

Hearsay statements are not competent summary judgment evidence.  But even assuming that Heard made a *prima facie* showing, the record raises no inference of pretext or motivating factor.  NOV presents evidence showing that several of the coplaintiffs — Darby, Jiles, Johnson, and Vital — were paid more than Heard for the same position.  (Docket Entry No. 78-1 at 24–25).  Vital was paid $13.00 per hour.  (Beverly Affidavit at Ex. 4).  Darby was paid $14.00 per hour.  (Darby Depo. at 64).   Jiles was paid $12.50 per hour.  (Jiles Depo. at 71).  Johnson was paid $15.00 per hour.  (Johnson Depo. at 45).  Heard was paid $12.00 per hour.  (Heard Depo. at Ex. 4).  There is no factual dispute material to determining whether Heard was paid less because he was African-American.  Summary judgment is granted on Heard's unequal pay claim.

### d.      Failure to Provide Educational Benefits

46

Heard alleged that NOV discriminated against him by refusing to provide him the same education benefits given to non-African-American employees.  NOV's motion to dismiss this claim was denied, and NOV has not moved for summary judgment.  The claim remains in the case.

### 5.    Billy Rose

#### a.    Denial of Raises

Rose alleged that NOV discriminated against him by denying him raises.  (Docket Entry No. 60 at 30).  NOV moved for summary judgment, arguing that the undisputed evidence shows that Rose received all of the raises he requested.  (Docket Entry No. 78-1 at 12).  Rose testified that he received a raise when he became a shipping coordinator and that he received two more raises between 2006 and 2012.  (Rose Depo. at 43–44).  Rose alleged that he was denied raises on other occasions when other, similarly situated non-African-American employees received them.  (Docket Entry No. 60 at 43).

Rose points to Michael Beasley as a comparator.  Beasley is white, and received a larger raise in April 2011 than Rose did.  (Rose Depo. at Exs. 8–9).  Beasley and Rose did not have the same job; Rose was an "Inventory Coordinator," while Beasley was a "Warehouser."  (*Id*.).  There is an inadequate basis to infer that Beasley is a comparator.

Rose testified that he "heard about other people that's gotten raises during the freeze."  (Rose Depo. at 164).  NOV responds that Rose's only evidence that other employees received raises is inadmissible hearsay.  (Docket Entry No. 78-1 at 13).  A subjective belief is insufficient  Rose neither submitted nor pointed to any record evidence supporting his belief.  (Rose Depo. at 164). "[U]nsubstantiated assertions are not competent summary judgment evidence . . . it is therefore incumbent upon the non-moving party to present evidence — not just conjecture and

speculation—that the defendant . . . and discriminated against [him]." *Grimes v. Texas Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 140 (5th Cir. 1996).

Summary judgment is granted on Rose's claim for discriminatory denial of raises.

### b.      Failure to Promote

Rose alleges that NOV discriminated against him by denying him promotions. (Docket Entry No. 60 at 5). NOV moved for summary judgment on the basis that Rose did not seek a promotion and could not show that he was better qualified for the jobs he applied for than the people who were hired. (Docket Entry No. 78-1 at 15–18). In his deposition, Rose testified that he never applied for the management or "lead man" positions that he thought he should have received. (Rose Depo. at 147–50, 244–45). He also testified that he did not have, and had not tried to get, the training necessary for a management position. (*Id*. at 147–150). His failure to apply for the promotions he wanted is fatal to his claim for discriminatory failure to promote. *See Kolpakchi v. Principi*, 113 F. App'x 633, 638 (5th Cir. 2004) ("[the plaintiff] did not apply for the position and thus cannot make out a prima facie case of employment discrimination").

### 6.      Jerome Johnson

### a.      Constructive Discharge

Johnson alleged that NOV constructively discharged him by creating a racially hostile work environment. (Docket Entry No. 60 at 34). NOV moved for summary judgment, contending that Johnson left NOV voluntarily. (Docket Entry No. 78-1 at 25–26).

The constructive-discharge claim requires Johnson to show that the "working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign," and that he did resign. *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004);

*see also McCoy v. City of Shreveport,* 492 F.3d 551, 557 (5th Cir. 2007) (stating same standard).

Courts look to the following factors in considering whether allegedly discriminatory conditions are objectively intolerable: "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; and (7) offers of early retirement on terms that would make the employee worse off." *Browning v. Sw. Research Inst.*, 288 F. App'x 170, 180 (5th Cir. 2008). The evidence must demonstrate a greater severity or pervasiveness of harassment than required to prove a hostile-work environment claim. *Derouen v. Carquest Auto Parts*, 275 F.3d 42 (5th Cir. 2001) (unpublished) (citing *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001)).

NOV contends that Johnson presents no competent summary judgment evidence that the "working conditions [were] so intolerable that a reasonable employee in his position would have felt compelled to resign" because there were no "aggravating factors." (Docket Entry No. 78-1 at 36). NOV also contends that Johnson presents no evidence that NOV "demoted, reassigned, harassed him, or reduced his pay, with the intent of encouraging him to quit," and that Johnson's testimony that he left for a higher-paying job precludes a finding that his working conditions were intolerable. (Docket Entry No. 78-1 at 37).

As discussed below, Johnson has raised fact disputes material to determine whether he suffered a hostile work environment. Courts have found that the severe and pervasive use of the word "nigger," continuing after complaints, supports finding constructive discharge. *See Delph v. Dr. Pepper Bottling Co. of Paragould*, 130 F.3d 349, 357 (8th Cir. 1997); *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 677 (7th Cir. 1993) (finding that the pervasive use of the word "nigger" was

49

"aggravated discrimination" sufficient to support a constructive-discharge claim); *Gonzalez v. Smith Int'l, Inc.*, 899 F. Supp. 2d 622, 641 (S.D. Tex. 2010) (denying summary judgment on a constructive-discharge claim when record evidence showed coworkers and supervisors referred to Hispanic employees, including the plaintiff, as "fucking Mexicans," "beaners," "wetbacks," and "niggers"); *see also* EEOC Decision No. 71–909, 3 Fair Empl. Prac. Cas. (BNA) 269 (1970) (supervisor habitual reference to black employees as "niggers" would have made the resignation of the charging party, who was white, a constructive discharge under Title VII); *but see Reedy v. Quebecor Printing Eagle, Inc.*, 333 F.3d 906, 910 (8th Cir. 2003) (concluding that evidence of graffiti associated with the plaintiff, including "coon," "all niggers must die," and "kill all niggers," the last of which remained after notice to the employer, precluded summary judgment on a hostile-work environment claim but not a constructive-discharge claim).

Johnson felt that his manager, Tammy Hurl, treated him and other African-American coworkers "differently." (Johnson Depo. at 137–39). He complained to manager Chris Little and Human Resources representative Vickie Jiles about this "different" treatment, and testified that after this complaint Hurl increased his work load and "things got worse for [him] in that department." (Johnson Depo. at 124–28). Johnson received a "final warning" from Hurl and Evans on January 14, 2011, disciplining him for missing a shipment to Algeria. (Johnson Depo at 96–102, Ex. 7). On January 17, 2011, Johnson sent an e-mail to Vickie Jiles with the subject "Hostile Environment," complaining that Hurl and Evans had disregarded progressive discipline, giving him a final written warning the first time he made an error; that Hurl was not training him; and that Hurl had an "attitude." (Johnson Depo. at 136–37, Ex. 8). Slack investigated Johnson's complaints. The

Algerian shipment Hurl and Evans alleged he had missed was found, and Johnson's "final warning" was reduced to a "second warning."  (Slack Depo. at 204).

Johnson testified that Guajardo, who was his supervisor after Hurl, called Johnson "boy," in front of Evans, who remained Johnson's manager.  (Johnson Depo. at 176–180).  Evans laughed when Guajardo called Johnson "boy."  (*Id.* at 176, 180, 181).  Johnson also testified that Guajardo made derogatory comments about his "nappy hair."  (*Id.* at 176 and 182–83).  Guajardo denied calling Johnson "boy" or making comments about his hair.  (Guajardo Depo. at 58).  Johnson testified that he heard the word "nigger" every day at work, particularly from Jasso.  (Johnson Depo. at 201, 212, 221).  Johnson asked Jasso to stop, and reported the language to Lemen, his manager at the time.  (*Id.* at 202–03).  Jasso did not stop using the word in front of Johnson.  (*Id.* at 212).  After Johnson complained to Lemen, he was moved to the receiving department.  (*Id.* at 133).  Johnson also testified that Jasso showed the picture of Vital's head pasted onto a gorilla's body in front of him, and that his managers laughed about it and asked him if he thought it was funny.  (*Id.* at 117–18).

Johnson testified that he worked in a segregated environment: African-American employees were forced to do physical labor outside while non-African-Americans performed sedentary tasks indoors.  (*Id.* at 174–79).  He also testified that he saw racist graffiti containing the word "nigger" in a bathroom stall.  (*Id.* at 223–26).  Johnson stated that he reported the graffiti to Lemen, and that it later looked like "someone tried to wipe it off, but the word 'nigger' was still there."  (*Id.* at 210-11).  The entire stall was painted over the next weekend.  (*Id.* at 212).

Johnson left NOV in February 2012 to accept a higher-paying job at Baker Hughes.  (*Id.* at 191).  Johnson testified that he felt like he "had to quit" NOV because of the working conditions,

but that he waited until he had another job to quit.  (*Id.* at 236–37).  Johnson testified that it was "best for [him] to leave instead of getting fired" but "with the environment, with the things that was going on, [he] was going to take anything that came along."  (*Id.* at 236).

Johnson has raised an issue of material fact regarding the presence of "aggravating factors" in the form of "badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation."  His testimony that his workplace was segregated; that his managers found racially derogatory remarks to be "funny"; and that his coworkers, supervisors, and managers regularly used racial slurs and epithets despite Johnson's repeated complaints and requests that they stop, is evidence of the necessary "aggravating factors."  Contrary to NOV's assertions that Johnson "never reported any alleged harassment to upper management or Human Resources," Johnson has presented evidence that he complained to Human Resources about a "hostile environment," that he reported the use of racial slurs to his manager, and that his work environment did not improve in response to his complaints.  Even after complaining to his manager and to Human Resources, Johnson still felt like he "had to leave."

Johnson has raised a factual dispute material to determining whether he was constructively discharged.  Summary judgment on this claim is denied.

### b.    Denial of Raises

Johnson claims that NOV denied him raises because he is African-American.  (Docket Entry No. 60 at 32).  NOV moved for summary judgment and presented evidence that it did not raise other employees' pay while refusing to raise Johnson's.  (Docket Entry No. 78-1 at 12–13).

Johnson testified that he knew of other employees who were not African-American who received raises, but he could not remember their names, he was unsure of the amount of the raises,

he did not know what these other employees made before or after the alleged raises, and knew only of what the others might have told him.  (Johnson Depo. at 194–95).  Johnson testified that an employee named "Eric" received a raise, but he did not point to any evidence and there is no statement.  (Docket Entry No. 60 at 32).  *Fowler v. Smith,* 68 F.3d 124, 126 (5th Cir. 1995).  Johnson's vague, conclusory, and hearsay-based statements are inadequate to support an inference that NOV discriminatorily denied Johnson raises.  NOV is entitled to summary judgment on this claim.

### c.      Failure to Promote

Johnson claims that NOV denied him a promotion to the field tech position because he is African-American.  (Docket Entry No. 60 at 32).  NOV moved for summary judgment, arguing that Johnson cannot show he was treated less favorably than employees who were not African-American.  (Docket Entry No. 78-1 at 29).  Johnson did not address NOV's arguments in his response.

Johnson applied for a promotion to the field tech position in August 2011.  (Docket Entry No. 60 at 32).  He testified that he did not know who was hired for the position.  (Johnson Depo. at 198).  Johnson has pointed to no evidence that the position was filled by someone who is not African-American.  Johnson has not established a *prima facie* case of discrimination because he has not shown that similarly situated employees who were not African-American were treated more favorably.  Summary judgment is granted on Johnson's failure to promote claims.

### 7.      Edward Jiles

### a.      Termination

Jiles claims that NOV discriminated against him by firing him.  (Docket Entry No. 60 at 38–39).  NOV moved for summary judgment, arguing that Jiles was fired for legitimate,

nondiscriminatory reasons and that he was replaced by an African-American employee.  (Docket Entry No. 78-1 at 23).

Jiles argues that there is direct evidence of discrimination because his supervisor, Guajardo, frequently used the word "nigger" during Jiles's last year at NOV.  (Docket Entry No. 80 at 46; Jiles Depo. at 129–31).  "Workplace remarks may constitute direct evidence of discrimination if they are '1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the [complained-of adverse employment decision]; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue.'"  *Patel*, 298 F.3d at 343–44, quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 222–23 (5th Cir. 2001) (alterations in original).  Guajardo's use of the word "nigger" is not direct evidence of discrimination because it does not relate to the decision to fire Jiles.  Guajardo's comments would not allow a jury to conclude, without inference, that Jiles was fired because of his race.

Because there is no direct evidence of discrimination, the *McDonnell Douglas* burden-shifting analysis applies.  To make a *prima facie* showing of discrimination, Jiles must show that similarly situated employees were treated more favorably under nearly identical circumstances or that he was replaced by someone outside the protected class.  *Bouie v. Equistar Chems. LP*, 188 Fed. App'x at 236–37.

Jiles was fired in April 2012 for "fraudulent behavior, attendance and poor performance." (Guajardo Depo. at Ex. 3).  He was replaced by an African-American man.  (Beverly Affidavit at 2;  Bidinger Depo. at 143–44).  In 2011, Jiles received multiple warnings for insubordination and "[s]ubstandard [w]ork."  (Jiles Depo. at Exs. 3, 4, 5,).  In August 2011, Jiles signed a document acknowledging that he had received a "third warning" for substandard work.  (*Id.* at Ex. 5).  He

received another "third warning" in March 2012. (*Id.* at Ex. 14). Jiles was also accused of falsifying a doctor's visit to get out of work. Jiles testified in his deposition that NOV asked him for documents to verify his doctor's visit and that he failed to provide it. (Jiles Depo. at 191–92). Jiles has not submitted or identified evidence that non-African-American employees who received repeated warnings for substandard performance, fraudulent behavior, and attendance problems were not terminated. Jiles has not made a *prima facie* showing of discriminatory termination. Summary judgment is granted on Jiles's discriminatory termination claim.

### b.      Failure to Promote

Jiles alleged that NOV discriminated against him by refusing to promote him to either a quality control or assembly position. (Docket Entry No. 60 at 37; Jiles Depo. at 138). NOV moved for summary judgment, arguing that the positions Jiles requested were transfers, not promotions, and that Jiles did not make a *prima facie* showing of discrimination. Jiles did not respond to NOV's arguments in favor of summary judgment on his failure to promote claim.

The elements of a plaintiff's *prima facie* showing of a discriminatory failure to promote are that: "(1) he was not promoted, (2) he was qualified for the position he sought, (3) he fell within a protected class at the time of the failure to promote, and (4) the defendant gave the promotion to someone outside of that protected class or otherwise failed to promote the plaintiff because of his race." *Autry v. Fort Bend Indep. Sch. Dist.*, 704 F.3d 344, 347 (5th Cir. 2013) (quoting *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002)). Jiles applied for a position in quality control and a position in assembly. (Jiles Depo. at 138). He does not identify or submit evidence showing that the position had better pay or benefits than his own position. NOV asserts and presented summary

judgment evidence that Jiles sought lateral transfers, not promotions. (Docket Entry No. 78-1 at 17). Jiles does not contradict this evidence.

Even if Jiles made a *prima facie* showing, he has not submitted or pointed to evidence that would raise a factual dispute material to determining about whether NOV's explanation that the employees who were selected for the quality control and assembly positions were "better qualified" was pretextual or whether race discrimination was a motivating factor. Jiles testified that an "older white dude" was given the quality control position. (Docket Entry No. 78-10 at 21–22). Jiles did not know anything about the qualifications of the "older white dude." (Jiles Depo. at 144). Jiles stated in his deposition that NOV did not initially fill the assembly position, but that a "tall white boy" was eventually transferred to the role. (*Id.* at 145). Jiles testified that the "tall white boy" told him that he had no experience and had never done assembly work before. (*Id.* at 146). But Jiles testified that he too did not have experience in assembly work and had never done it before. (*Id.*). The record evidence does not raise a factual dispute material to determining whether Jiles was more qualified than the white employees who received positions he wanted, whether the stated reason was pretextual, or whether race was a motivating factor. Summary judgment is granted on Jiles's failure to promote claim.

### c.      Suspension

Jiles claims that NOV discriminated against him by suspending him. Although NOV asserted that Jiles was not suspended, NOV did not move for summary judgment on this claim. (Docket Entry No. 78-1 at 44). The claims remain in the case.

### 8.    DaWarren Bellard

#### a.    Termination

Bellard claims that NOV discriminated against him by firing him.  NOV moved for summary judgment on this claim, asserting that it fired Bellard for poor performance.  (Docket Entry No. 78-1 at 31–33).

Bellard claims that there is direct evidence of discrimination because Evans made the decision to fire him and exhibited discriminatory animus in his workplace epithets.  (Docket Entry No. 80 at 44).  Evans's statements are not related to the decision to fire Bellard and require an inference to conclude that Bellard was fired because of his race.  *See Moss v. BMC Software, Inc.*, 610 F.3d 917, 929 (5th Cir. 2010) (explaining that, "for [a discriminatory] comment to be probative of an employer's discriminatory intent, it must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that [discrimination] was an impermissible factor in the decision to terminate the employee.").  The *McDonnell Douglas* burden-shifting analysis applies.

Bellard contends that after he went on medical leave, Barajas and Evans sought to have him fired.  (Docket Entry No. 90 at 31).  Slack testified that she told Barajas that Bellard could not be terminated while he was on leave.  (Slack Depo. at 79–81, Exs. 8–9).  Barajas sent an e-mail to Slack while Bellard was on leave, explaining that Bellard was "due a final write up which will lead to termination."  (*Id.* at Ex. 9).

Bellard testified that Barajas informed him that he was being terminated because of a write-up from Evans, done just before Bellard left on leave.  (Bellard Depo. at 183; Ex. 9).  Bellard contends that Evans "could not offer any specific testimony for Bellard's termination and claims that

Omar Barajas was the manager involved in the termination."  The pages Bellard cited from Evans's deposition were not filed with the court.  (Docket Entry No. 80 at 22).  Barajas testified that he did not work with Bellard enough to evaluate his performance, but that he was present when Bellard was issued the write up.  (Barajas Depo. at 95–98).  Bellard does not dispute that he received the write up or that it was issued for discriminatory reasons.  Even assuming that Evans was involved in deciding to fire Bellard, there is no evidence showing that a similarly situated non-African-American employee was treated more favorably than Bellard or that Bellard was replaced by someone outside the protected class.

NOV contends and presents summary judgment evidence that Bellard was terminated "because of ongoing poor performance, evidenced by the numerous corrective actions and counseling he received during his last year of employment."  (Docket Entry No. 78-1 at 33).  Bellard points to no controverting evidence.  Bellard testified that it was his understanding that he was fired for too many write ups.  (Bellard Depo. at 186).  Nor has Bellard identified or presented summary judgment evidence showing that Bellard's poor performance was a pretext for racial discrimination or that racial discrimination was a motivating factor.  Summary judgment is granted on Bellard's discriminatory termination claim.

### b.    Failure to Promote

Bellard alleged that NOV discriminated against him by denying him promotions.  NOV moved for summary judgment on the basis that Bellard never applied for a promotion.

Bellard testified that he applied for a "packer" position in the same department where he worked as a "puller."  Bellard testified that he asked Evans, his manager, for a change in job duties by asking "[s]ince I'm getting all these write-ups, can I just go to packing?"  (Bellard Depo. at 190).

Bellard testified that he did not know if there was an open position in packing at the time.  (*Id.* at 191).  NOV argues and presents summary judgment evidence that the "packer" position was a lateral transfer, not a promotion.  (Docket Entry No. 78-1 at 16).

Bellard testified that packers and pullers are both materials handling positions and that the packer position did not have a different job title or pay rate from Bellard's position as a puller.  (*Id.* at 189–192).  Bellard has not made a *prima facie* showing that he applied for a promotion that was denied.  Summary judgment is granted on Bellard's failure-to-promote claim.

### c.      Denial of Raises

Bellard claims that NOV discriminated against him by denying him raises.  NOV moved for summary judgment on the basis that Bellard was not treated differently than his non-African-American coworkers.  Bellard's deposition testimony confirms NOV's assertions.  He stated that he did not know of any non-African-American employees who worked the same job and who received raises during the relevant period when he did not.  (Bellard Depo. at 69–70, 113–14).  Summary judgment is granted on Bellard's claim for a discriminatory denial of raises.

### d.      Discriminatory Suspension

Bellard alleges that NOV discriminated against him by forcing him to go on leave.  NOV did not move for summary judgment on these claims.  Bellard's claim for discriminatory suspension remain in the case.

### B.      The Plaintiffs' Hostile Work Environment Claims

NOV moved for summary judgment on all of the plaintiffs' hostile work environment claims.  NOV argues that the plaintiffs were not targeted by the comments and harassment they complain of; that the conduct did not affect any term, condition, or privilege of their employments; and that

NOV did not know of the conduct complained of and fail to act.  NOV also asserts a defense based on *Faragher-Ellerth*, arguing that no supervisory harassment culminated in a tangible employment action.

Many of the plaintiffs claim that they often heard verbal harassment directed not at them, but at other employees.  Vital testified that he heard Jasso call coplaintiff Bellard a "black African monkey." (Docket Entry No. 60 at 7).  Other plaintiffs saw the photograph Jasso made showing Vital's head on a gorilla's body, heard Jasso make jokes about Vital's "nigger hands," or learned that a noose had been discovered in another NOV department.  (Docket Entry No. 60 at paras. 25, 51–55, 110, 120, 126, 142,172).  Lane heard Bidinger tell another African-American employee, "I will have your black ass."  (*Id.* at 22).  Rose testified that he heard a coworker yell "mother fucking nigger" at another African-American employee.  (Lane Depo. at 223–27).  All of the plaintiffs claimed that they heard coworkers use the word "nigger" when talking to others.  (*Id.* at 37, 58, 102, 118–19, 138–40, 150, 167, 173).

Such "second-hand" harassment carries less evidentiary weight in a hostile-work-environment case than actions or remarks that are directed at the plaintiff.  *See Johnson v. TCB Const. Co., Inc.*, 334 Fed. App'x 666, 671 (5th Cir. 2009) (*per curiam*) (unpublished); *see also, e.g., Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005) (stating that "second-hand harassment," although relevant, carries less weight than remarks or actions directed at the plaintiff); *Jennings v. Univ. of N.C.*, 444 F.3d 255, 272 (4th Cir. 2006) (same); *McKenzie v. Milwaukee County*, 381 F.3d 619, 624–25 (7th Cir. 2004) (holding that the plaintiff's hostile-work-environment claim failed because many of the incidents were not directed toward her); *Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 759–60 (8th Cir. 2004) (holding that the plaintiff had failed to present

sufficient evidence that the harassment was severe because the alleged comments were not directed toward him, did not refer to him, and in some instances were merely overheard by him); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) (the fact that most of the comments were not directed at the plaintiff contributed to the conclusion that the evidence was insufficient to show a hostile work environment); *Boutin v. Exxon Mobil Corp.*, 730 F. Supp. 2d 660, 671 (S.D. Tex. 2010) (the plaintiff's complaints related to sexist comments made to others, which were entitled to less evidentiary weight than comments directed to the plaintiff).

Although second-hand evidence is entitled to less evidentiary weight, it is relevant. *See Johnson v. TCB Const. Co., Inc.*, 334 Fed. App'x 666, 671 (5th Cir. 2009) (*per curiam*) (unpublished). Contrary to NOV's assertions, each plaintiff also presented sufficient summary-judgment evidence related to harassment that was directed at him. (Docket Entry No. 78 at 29). Darby alleged that Jasso frequently said "what's up nigger?" to him, and that a non-African-American coworker told him that "blacks don't last long" at Mission. (Docket Entry No. 60 at 10, 13). Heard testified that his supervisors called him "boy," and that he saw racist graffiti. (Docket Entry No. 60 at ¶ 108). Johnson testified that his managers mocked him for his "nappy" hair and that Guajardo called him "boy" several times in front of NOV management. (Docket Entry No. at 33–34) Rose stated that McCullough frequently referred to him as "boy." (Docket Entry No. 60 at 34).

NOV argues that Jasso's comments should be disregarded because he used the word "nigger" "as part of regular conversation, in an attempt to be 'hip' and 'cool,' to be friends with Plaintiffs, and as a form of greeting." (Docket Entry No. 78-1 at 29). NOV also argues that Bidinger's use of "bubba," "peon," and "squirrel," were not racist. (*Id.* at 34). A hostile-work-environment claim

61

does not depend on the harasser's subjective belief that his conduct or words are offensive.  *See Jackson v. Quanax Corp.*, 191 F.3d 647, 662 (6th Cir. 1999) (finding the trial court's exclusion from evidence of racial slurs as "conventional conditions on the factory floor" "disturbing," and rejecting a characterization that those slurs were not harassing because they were "part of the every-day banter on the shop floor").

"[I]f the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993).  If the environment would reasonably, and is, perceived as hostile or abusive, it need not also be psychologically injurious. *Harris*, 510 U.S. 17, 22 (citing *Meritor*, 477 U.S., at 67).

The plaintiffs have alleged and presented evidence that their work environment was hostile and abusive, and that it affected them emotionally.  Vital testified that he was "embarrassed," "in shock," and laughed at in a toolbox meeting when Jasso displayed the picture of Vital's head pasted on a gorilla's body.  (Vital Depo. at 195).   Vital testified that the incident bothered him for days afterwards because he could not get NOV management to address it.  (*Id.* at 199).  Vital also testified that he felt that he was treated like a dog or an animal because his supervisors got his attention by whistling at him instead of calling him by name.  (*Id.* at 213–14).  Darby stated in his deposition that "I've never felt so uncomfortable in my life, never in my life.  The word 'nigger,' it was redundant, more common than cigarette smoke.  You heard it everyday, all day, from guys that wasn't black." (Darby Depo. at 195).  Lane testified that he ate lunch at his desk to avoid the frequent use of the word "nigger" in the lunchroom.  (Lane Depo. at 101; Docket Entry No. 80 at 5).  Rose and Bellard also testified that they avoided the break room because the word "nigger" was so often used.  (Rose

Depo. at 203; Bellard Depo. at 201-03).  Heard testified that he cried on multiple occasions because of the hostile treatment he experienced.  "I started crying.  And I needed my job.  I couldn't say nothing back to him.  He made me cry.  He called me a nigger."  (Docket Entry No. 90-4 at 231–32). Johnson testified that he left NOV in response to a "racially hostile work environment."  (Johnson Depo. at 216).  Although Jiles testified that there was no "negative vibe" between himself and McCullough, and characterized some employees' use of the word "nigger" as "cracking jokes," he did not, contrary to NOV's assertion, say that he found it acceptable.  Jiles made clear that he found the word deeply offensive.  (Jiles Depo. at 81, 126–29).  Jiles testified that the graffiti he saw in the bathroom was "very racist to me."  He made multiple complaints about harassment.  (Jiles Depo at 135–39).

The specific incidents that the plaintiffs have alleged are all extreme.  Some courts have found it inappropriate to enter judgment as a matter of law for the employer on a hostile-work-environment claim when a plaintiff submits evidence of even one instance of the highly offensive racial terms the plaintiffs stated they heard on a repeated, routine, and recurring basis.  *See, e.g., Rodgers v. Western–Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." (internal citations omitted)); *Bailey v. Binyon*, 583 F. Supp. 923, 927 (N.D. Ill. 1984) ("The use of the word 'nigger' automatically separates the person addressed from every non-black person; this is discrimination per se."); *see also Causey v. Sewell Cadillac–Chevrolet, Inc.*, 394 F.3d 285, 289 n. 2 (5th Cir. 2004) ( "Indeed, a racial epithet does demonstrate racial animus."); *Brown v. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993)

("unlike certain age-related comments which we have found too vague to constitute evidence of discrimination, the term 'nigger' is a universally recognized opprobrium, stigmatizing African–Americans because of their race"); *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1141 (10th Cir. 2008) "[C]ourts have recognized that a noose may constitute part of a hostile environment claim."  The term "boy" is recognized as highly offensive when used "in certain contexts." (collecting cases).  *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001) ("Far more than a mere offensive utterance, the word 'nigger' is pure anathema to African–Americans.  Perhaps no single act can more quickly . . . create an abusive working environment than the use of an unambiguously racial epithet such as 'nigger").  *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885–86 (6th Cir. 2008).

In other cases, the Fifth Circuit has entered judgment as a matter of law despite evidence of such clearly offensive racial epithets. *See, e.g., Johnson v. TCB Constr. Co, Inc.*, 334 F. App'x 666, 671 (5th Cir. 2009) (per curiam) (unpublished) ("[A]lthough Turner's alleged comment to Johnson that he was just 'like a damn nigger' in asking for a raise is repulsive, it is isolated and Johnson has offered no evidence concerning its objective effect on his work performance." (quotations omitted)); *Turner v. Baylor Richardson Medical Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007) (holding that a supervisor's comments about "ghetto children" was not sufficient to create a fact issue as to severe and pervasive harassment).

NOV argues that the plaintiffs have not presented evidence showing that the allegedly harassing conduct interfered with their work performance or with other work terms or conditions. (Docket Entry No. 78-1 at 30).  NOV asserts that the plaintiffs' claims that they should have received raises and promotions shows that the conduct did not destroy their ability to succeed at

NOV.  (*Id.*).  NOV argues that to be actionable, harassment must "destroy[] plaintiff's ability to succeed in the workplace."  (Docket Entry No. 78-1 at 30).  The plaintiffs did not address this argument in their response.  (Docket Entry No. 80).

Although "whether [a work environment] interferes with an employee's work performance" is a factor to consider in determining whether a plaintiff's work environment was objectively offensive, "[n]o single factor is determinative."  *EEOC v. WC&M Enters., Inc.,* 496 F.3d 393, 399 (5th Cir. 2007) (internal citations omitted) ("To determine whether the victim's work environment was objectively offensive, courts consider the totality of the circumstances, including: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance.  No single factor is determinative."); *see also Mendoza v. Helicopter*, 548 F. App'x 127, 129 (5th Cir. 2013).  This argument does not support summary judgment dismissing the hostile-work-environment claims.

NOV also argues that none of the plaintiffs has shown that NOV knew about the harassment before the plaintiffs complained or that it failed to take prompt remedial action when they did.  (Docket Entry No. 78 at 31).  "When a company, once informed of allegations of [ ] harassment, takes prompt remedial action to protect the claimant, the company may avoid Title VII liability."  *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 402 (5th Cir.1993).  "'Prompt remedial action' must be 'reasonably calculated' to end the harassment."  *Stewart v. Miss. Transp. Com'n*, 586 F.3d 321(5th Cir. 2009) (quoting *Hockman v. Westward Comms., LLC*, 122 Fed. App'x 734 (5th Cir. 2004)).  Although this requires a case-by-case determination, the Fifth Circuit has "that an employer took prompt remedial action as a matter of law."  *Williams-Boldware v. Denton County, Tex.*, 741 F.3d

635, 640 (5th Cir. 2014) (collecting cases).   "One factor [the Fifth Circuit has] found dispositive is whether the plaintiff reasonably took advantage of corrective opportunities provided by the employer."  *Id.*

NOV claims that it was not informed of the plaintiffs' allegations of harassment, including Jasso's distribution of the photograph showing Vital's head pasted onto a gorilla's body, the comments Darby testified that he heard about black Barbie dolls, and the drawings Heard said he saw on coworkers' clipboards.  (Docket Entry No. 78 at 31).  NOV also claims that it responded promptly when the plaintiffs complained.  (Docket Entry No. 78 at 31).  NOV points to evidence that it removed racially offensive graffiti from a bathroom "immediately" after Bellard, Heard, and Johnson reported it to NOV; that Jasso stopped using the word "nigger" directed at Bellard after Bellard complained to Lemen; and NOV suspended Sanchez after he called an African-American employee a "nigger."  (Docket Entry No. 78 at 31–32).

The plaintiffs respond that these are but a few instances of harassment that was so open, long-standing, and pervasive that NOV was on constructive notice.  "Despite any lack of actual knowledge, an employer may have constructive knowledge when the harassment is pervasive." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 656 (5th Cir. 2012) *cert. denied*, 133 S. Ct. 136, 184 L. Ed. 2d 29 (2012) (*Sharp v. City of Houston*, 164 F.3d 923, 930 (5th Cir. 1999)).   If an employer is on constructive notice, it "is not necessarily insulated from liability just because there is a grievance procedure, even if the victim has failed to utilize it."  *Sharp v. City of Houston*, 164 F.3d 923, 930 (5th Cir. 1999).

NOV gives a copy of its antiharassment policy to all new employees.  (Docket Entry No. 78-4 at 2-3).  The antiharassment policy states that employees should immediately report harassment,

66

discrimination, or retaliation to either their direct supervisors or to the human resources department. (Docket Entry No. 78-4 at 6).  The supervisor or human resources department is required to take the complaint seriously, promptly investigate, and ask the employee to put the complaint in writing. (*Id.*)  After the investigation is completed, the human resources department is to notify the employee who filed the complaint of the results of the investigation.  (*Id.*)

The plaintiffs provided evidence that there was racial graffiti in the public areas of NOV's work sites, including the bathrooms, and that racial slurs were openly used in common break rooms and lunch rooms.  (Jiles Depo. at 126; Bellard Depo. at 226–28).  Multiple plaintiffs testified that supervisors either made the offensive statements themselves or were present when others do so. (Darby Depo. at 168; Rose Depo. at 183, 200, 235; Heard Depo. at 229–31; Jiles Depo. at 128–31; Lane Depo. at 198, 303–06).  The plaintiffs also testified that they or others reported offensive conduct to the human resources department.  The complaints stopped because the plaintiffs received no helpful responses.  (Jiles Depo at 129–34; Lane Depo. at 178–81).  The plaintiffs have raised factual disputes material to determining whether NOV had constructive notice about alleged harassment.  The plaintiffs complained until NOV failed to respond.

The plaintiffs also testified that the harassment did not stop in response to their complaints. Vital alleged that he was still called a "nigger" after he complained to Lemen, Evans, and Pam Jiles, and that Jasso continued to mock him in public meetings after Vital complained to Evans and Pam Jiles about the picture of Vital's head on the body of a gorilla.  (Vital Depo. at 188–210; 265–66). Darby, Johnson, and Bellard also alleged that Jasso's harassing conduct continued after complaints to management.  (Darby Depo. at 196; Johnson Depo. at 212; Bellard Depo. at 197–201).  Vital, Johnson, Rose, and Lane all testified that their supervisors continued to treat them in ways that they

found harassing. even after the plaintiffs asked them to stop.  (Vital Depo at 274–77; Johnson Depo. at 125–130; Rose Depo. at 206; Lane Depo. at 198, 299, 305).  The plaintiffs have also raised fact disputes material to determining NOV's failure to take remedial action.

The plaintiffs also allege that they were harassed by their supervisors.  NOV asserts that the *Faragher-Ellerth* affirmative defense applies because the plaintiffs have not alleged that the "harassment culminated in a tangible employment action."  (Docket Entry No. 78-1 at 43).  If a plaintiff makes a *prima facie* showing of a hostile work environment, and no tangible employment action occurred, an employer may assert an affirmative defense.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).  The *Faragher-Ellerth* defense requires two elements: (1) "the employer exercised reasonable care to prevent and correct promptly any" harassing behavior; and (2) the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Id.*  "No affirmative defense  is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment."  *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998).

NOV asserts that all of the plaintiffs received and read the anti-harassment policy.  (Docket Entry No. 78-1 at 43).  Although the plaintiffs dispute whether the harassment policy was applied at NOV or explained to the employees, the plaintiffs have presented evidence that they complied with the antiharassment policy by reporting at least some of the harassment to supervisors or to the human resources department, with no apparent effect.  (Vital Depo at 274–77; Darby Depo. at 196; Lane Depo. at 178–81, 198, 299, 305; Heard Depo. at 43; 223–24, 238; Rose Depo. at 206; Johnson Depo. at 125–30, 212; Jiles Depo. at 129–34; Bellard Depo. at 197–201).

As discussed above, the plaintiffs have presented sufficient summary-judgment evidence to raise a factual dispute as to whether they were diligent in reporting their complaints of harassment and whether NOV's supervisors and human resources department investigated and took prompt remedial action.  These factual issues preclude summary judgment based on the *Faragher-Ellerth* affirmative defense.  The hostile-work-environment claims remain in this case.

### C.     Retaliation Claims

#### 1.     Legal Standard

Claims of retaliation under Title VII, § 1981, and the Texas Labor Code are analyzed under the same standard.  *Shackelford*, 190 F.3d at 403–04 n.2 (5th Cir. 1999).  "To present a *prima facie* case of retaliation under . . . Title VII . . . a plaintiff must show that: (1) he engaged in an activity protected by Title VII; (2) he was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action."  *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).  Complaining to supervisors about racial discrimination or harassment is a protected activity.  *See Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427–28 (5th Cir. 2000) ("Under Title VII, an employee has engaged in protected activity if he or she has (1) 'opposed any practice made an unlawful employment practice by this subchapter,' or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" (emphasis omitted) (quoting 42 U.S.C. § 2000e–3(a))); *Carrera v. Commercial Coating Servs. Int'l*, 422 F. App'x 334, 339 (5th Cir. 2011). To survive summary judgment on their retaliation claims, the plaintiffs must raise a genuine factual dispute material to determining that NOV unlawfully retaliated against them for opposing racial discrimination or harassment.

If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to proffer a legitimate, nonretaliatory reason for the employment action. *Id.* If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation. *Id.* "Title VII retaliation claims must be proved according to traditional principles of but-for causation. . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, —— U.S. ——, 133 S.Ct. 2517, 2533, 186 L.Ed.2d 503 (2013); *see also Wright v. St. Vincent Health Sys.*, —— F.3d ——, 2013 WL 5225214, at *4 (8th Cir. Sept.18, 2013) (applying "but for" causation to a § 1981 retaliation claim).

Title VII's antiretaliation provision "must be construed to cover a broad range of employer conduct" than its antidiscrimination provision. *Thompson v. N. Am. Stainless, LP*, —— U.S. ——, 131 S. Ct. 863, 178 L. Ed. 2d 694 (2011). In *Burlington Northern and Santa Fe Railroad Co. v. White*, 548 U.S. 53 (2006), the Supreme Court held that employer actions prohibited by the antiretaliation provision, unlike actions prohibited under the antidiscrimination provision, were not limited to conduct that affects the employee's "compensation, terms, conditions, or privileges of employment," § 2000e-2(a)(1), because adopting that approach "would not deter many forms that effective retaliation can take." *Id*. at 64. The Court interpreted Title VII's antiretaliation provisions again in *Thompson v. North American Stainless, L.P.*, holding that those provisions were broad enough to protect an employee who was fired in retaliation for a discrimination charge filed by family member. "Title VII's antiretaliation provision prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 868 (quoting *Burlington N.*, 548 U.S. at 68). "It does so by prohibiting employer actions that are

70

likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Burlington N.*, 548 U.S. at 68 (internal quotation marks and citation omitted). Nevertheless, "normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.*

### 2.    Junious Vital

Vital retains three claims for retaliation after NOV's motion to dismiss: wrongful discipline, termination, and failure to rehire.

#### a.    Wrongful Discipline

Vital claims that NOV retaliated against him by disciplining him in April 2011 for not clocking out at lunch. (Docket Entry No. 60 at 46). Vital claims that the "written warning" he received for this incident was in retaliation for complaints he made about the picture Jasso circulated. (*Id.* at 10). Viles asserts that his manager, Guajardo, "ordered [him] to take co-worker Sanchez to a restaurant to get lunch," that Vital had already taken his lunch break, and that Vital did not clock out because he did not consider himself to be on his lunch break. NOV contends that the record fails to show that the discipline was causally connected with Vital's complaint. (Docket Entry No. 78-1 at 57). Vital did not respond to NOV's motion for summary judgment on his retaliatory discipline claim, did not specifically address his April 2011 write-up in the deposition testimony provided to the court, and has pointed to no evidence of a causal link between that discipline and his complaint about Jasso. Vital testified that he believed "the primary reason" he was given "most of [his] write-ups" was "pretty much just because I'm African-American." (Vital Depo. at 136–37). Summary judgment is granted on Vital's retaliatory discipline claim.

#### b.    Termination

71

Vital claims that NOV retaliated against him by firing him. (Docket Entry No. 60 at 46). Vital did not specify what protected activity his firing was in retaliation for. (*Id.*). On summary judgment, NOV contends that it fired Vital for the legitimate, nonretaliatory reason that he failed to return to work after his FMLA leave expired. (Docket Entry No. 78-1 at 57). Vital did not respond to NOV's motion for summary judgment on his retaliatory termination claim. He has not pointed to evidence that NOV's proffered reason was pretextual. In his deposition, Vital testified that "I just felt that [my termination] was a retaliation thing and they were going to let me go — they were going to do whatever they wanted to do because they was already — they were already racially discriminative against me anyway." (Vital Depo. at 262). He also testified that he believed he was fired so that NOV could "get rid of me as an African-American." (Vital Depo. at 264). Such subjective beliefs are insufficient. NOV is entitled to summary judgment on Vital's retaliatory termination claim.

### c.     Failure to Rehire

Vital claims that NOV retaliated against him by failing to hire him back when he was fired after his FMLA leave expired. (Docket Entry No. 60 at 46). NOV moved for summary judgment, arguing that Vital did not apply for a job at NOV after his termination. As discussed above in ruling on NOV's motion to dismiss Vital's claims for discriminatory failure to hire, Vital admitted in his deposition that he never applied for a job at NOV after he was fired. (Vital Depo. at 254–55, 261, 262). Vital's claim that NOV failed to rehire him in retaliation for his complaints fails as a matter of law.

### 3.     Damon Darby

### a.     Denial of Raises

Darby claims that NOV retaliated against him by refusing to give him raises that were awarded to non-African-American employees.  NOV moved for summary judgment, arguing that Darby did not engage in protected activity and his supervisors did not know about any complaints he made.  (Docket Entry No. 78-1 at 42–43).  Darby did not respond to NOV's motion to dismiss his discriminatory denial of raises claim.  (Docket Entry No. 80).

Darby testified that he never complained to Human Resources about perceived discrimination against African-Americans at NOV.  (Darby Depo. at 104–05).  Darby complained only to coplaintiff Billy Rose.  (*Id.* at 104–05, 198).  Darby testified that he asked Barajas, Evans, Guajardo, and Randy Kelly for a raise in late 2011.  (*Id.* at 204–06; 306).  Darby has not offered any evidence to show that he complained to Barajas, Evans, Guajardo, or Kelly, or that any of them knew about any protected conduct that Darby engaged in.  "If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct."  *Chaney v. New Orleans Pub. Facility Mgmt., Inc.,* 179 F.3d 164, 168 (5th Cir. 1999).  Darby has not made a *prima facie* showing of discriminatory denial of raises.  Summary judgment is granted on his denial of raises claim.

### 4.    David Lane

Lane asserts claims for retaliation based on his termination and the "creation or intensification of a hostile work environment."  (Docket Entry No. 60 at 47).

### a.    Termination

Lane claims that NOV retaliated against him for making a complaint about Bidinger by firing him.  In February 2011, Lane complained to Human Resources manager Ivy that Bidinger had told

another African-American employee "I will have your black ass." (Docket Entry No. 60 at 22). Lane was terminated in August 2011.

NOV moved for summary judgment, arguing that Lane could not show a causal link between his complaint in February 2011 and his termination in August 2011. (Docket Entry No. 78-1 at 58-59). NOV argues that "Otto Hallberg and/or Jack Peoples" made the decision to fire Lane and did not know about Lane's February 2011 complaint. "If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct." *Chaney v. New Orleans Pub. Facility Mgmt., Inc.,* 179 F.3d 164, 168 (5th Cir. 1999). The summary-judgment evidence supports NOV's assertion that either Hallberg or Peoples made the decision to fire Lane. (Ivy Depo. at 129–130). Lane has not alleged that Hallberg or Peoples knew about his February 2011 complaint, or offered any evidence to support such a contention. Because Lane has not raised a material factual dispute over whether there was a causal link between his complaint and his termination, summary judgment is granted on his retaliatory termination claim.

### b.      Hostile Work Environment

Lane claims NOV retaliated against him for requesting to be moved to the day shift by the "creation or intensification of a hostile work environment." (Docket Entry No. 60 at 47). NOV moved for summary judgment, arguing that retaliatory creation of a hostile work environment is not a recognized cause of action, and that the conduct Lane alleged did not rise to the level of a hostile work environment. (Docket Entry No. 78-1 at 58).

NOV argues that retaliatory creation of a hostile work environment is not a recognized cause of action in the Fifth Circuit. In *Bryan v. Chertoff*, 217 F. App'x 289, 293 (5th Cir. 2007), the Fifth

Circuit did not decide whether to recognize retaliatory hostile work environment claims under Title VII.  Instead, the Fifth Circuit affirmed the grant of summary judgment in *Bryan* because the plaintiff had not made a *prima facie* case of hostile work environment.  Other circuits have all recognized a retaliatory hostile work environment claim under Title VII.  *See Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012); *See Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 928–29 (8th Cir.2007); *Jordan v. City of Cleveland,* 464 F.3d 584, 598 (6th Cir. 2006); *Jensen v. Potter,* 435 F.3d 444 (3d Cir. 2006), *abrogated on other grounds by Burlington N.*, 548 U.S. 53; *Hussain v. Nicholson,* 435 F.3d 359, 366–67 (D.C. Cir. 2006); *Noviello v. City of Boston,* 398 F.3d 76, 88 (1st Cir. 2005);  *Von Gunten v. Maryland,* 243 F.3d 858, 864–65 (4th Cir. 2001), *abrogated on other grounds by Burlington N.*, 548 U.S. 53; *Ray v. Henderson,* 217 F.3d 1234, 1244–45 (9th Cir. 2000); *Richardson v. N.Y. State Dep't of Corr. Serv.,* 180 F.3d 426, 446 (2d Cir. 1999), *abrogated on other grounds by Burlington N.,* 548 U.S. 53; *Gunnell v. Utah Valley State Coll.,* 152 F.3d 1253, 1264 (10th Cir. 1998); *Knox v. Indiana,* 93 F.3d 1327, 1334–35 (7th Cir. 1996).  The Fifth Circuit has previously recognized a retaliatory hostile work environment claim under the Energy Reorganization Act's whistleblower provision.  *See Williams v. Admin. Review Bd.*, 376 F.3d 471, 476–77 (5th Cir. 2004).  For the purposes of ruling on NOV's motion for summary judgment, the court assumes that such a claim exists under Title VII.

The elements of a hostile work environment claim are that: (1) the plaintiff belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on membership in the protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) the defendant knew or should have known of the harassment, yet failed to take prompt remedial action.  *Felton v. Polles*, 315 F.3d 470, 484 (5th Cir. 2002). For

harassment to affect a term, condition, or privilege of employment, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) (internal quotation marks and citation omitted); *see also Watkins v. Texas Dept. of Crim. Justice*, 269 F. App'x. 457, 463–464 (5th Cir. 2008) (*per curiam*) (unpublished).   Courts must consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance." *Harris*, 510 U.S. at 23.

Lane does not allege all of the facts of his hostile work environment claim in support of his claim for retaliatory hostile work environment.  The only acts he claims were retaliatory are that: Bidinger refused to speak with him after his complaints about the night shift, and Mark Wynot "would look at [him] like [Lane] just cursed him out."  (Lane Depo. at 405–06).  Lane asserts that Bidinger and Wynot's conduct created a hostile work environment because it had the effect of "shutting down of all [] lines of communication that [he] had" and "hindered Lane from doing his job."  (*Id.* at 405; Docket Entry No. 80 at 58).

"Silent treatment" and dirty looks, standing alone, do not create a hostile work environment. *See Washington v. Am. Drug Stores, Inc.*, 119 F. App'x 3, 6 (7th Cir. 2004) (finding a boss's "silent treatment" and hostility did not create a hostile work environment); *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 517–18 (7th Cir. 1996) (affirming summary judgment where plaintiff did not put forth any evidence that his boss's confrontational behavior and "silent treatment" were a result of his religion or national origin); *Zayas-Ortiz v. Becton Dickinson Caribe, Ltd.*, 968 F. Supp. 2d 463, 474 (D.P.R. 2013) (boss's refusal to talk to the plaintiff for "a stretch of two or three weeks" did not

create a hostile work environment); *Jenkins v. Med. Labs. of E. Iowa, Inc.*, 880 F. Supp. 2d 946, 965 (N.D. Iowa 2012) *aff'd*, 505 F. App'x 610 (8th Cir. 2013) (coworkers' "silent treatment" and annoyance with the plaintiff was nothing more than "rude, abrasive, unkind or insensitive," and did not support a finding of a hostile work environment); *Allen v. Adv. Digital Info. Corp.*, 500 F. Supp. 2d 93, 105 (N.D.N.Y. 2007) (boss's "silent treatment" "might support an inference of unprofessional conduct" but "do not support a claim for a sex based hostile work environment"); *Ginger v. District of Columbia*, 477 F. Supp. 2d 41, 55 (D.D.C.2007) (alleged harassment, including placement of drawing on locker depicting employees as KKK members, receiving Nazi salutes from coworkers, and silent treatment by other officers, was not sufficiently severe or pervasive to support hostile-work-environment claim); *see also McDonnell*, 84 F.3d at 258 (implying in dicta that "anger, irritation, dirty looks, even the silent treatment can cause distress" but do not constitute materially adverse employment action sufficient to sustain retaliation claim); *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 969 (8th Cir. 1999) (holding that "ostracism and disrespect by supervisors" is not an adverse employment action and cannot support a retaliation claim) (collecting cases).

The actions Lane alleges were retaliatory cannot, standing alone, create a hostile work environment. His retaliatory hostile work environment claims fail as a matter of law.

### 5.   Herbert Heard

Heard claims that NOV retaliated against him by firing him. (Docket Entry No. 60 at 47). NOV moved for summary judgment, arguing that Heard did not engage in protected activity and, even if he did, the people who decided to fire him were unaware of the alleged protected activity. (Docket Entry No. 78-1 at 54).

NOV argues that Heard did not engage in protected activity because Heard testified that he did not complain to a supervisor or the human resources department about any alleged discrimination or harassment. (Docket Entry No. 78-1 at 54; Heard Depo. at 47, 139, 225). In response, Heard points to portions of his deposition in which he testified that he told Rodney Williams, a human resources department employee, that Williams's supervisors called him names, including "nigger"; that there was racial graffiti on the walls; and that one of his supervisors told him to "put [his] kids in a closet." (Heard Depo. at 223). Heard testified that he talked to Williams a "couple of months" before he was fired. (*Id*. at 219–20).

Heard engaged in protected activity when he complained to Williams. The fact that Williams was Heard's brother-in-law does not change the fact that Heard complained about workplace discrimination and hostility to a member of NOV's human resources department. (Docket Entry No. 86-2 at 13). The temporal proximity supports Williams's argument that he has made a *prima facie* showing.

NOV has proffered legitimate, nonretaliatory reasons for Heard's termination. Heard admitted that he received a disciplinary write up when he caused a pallet of parts worth $8,000.00 to be damaged while trying to "put [the] parts high in the air." (Heard Depo. at 175–79, Ex. 7). Heard also admitted that he was repeatedly written up on poor performance and once for attempting to clock out early after recently attending a training addressing such conduct. (Heard Depo. at 39–40, 1875–96). Heard contends that he did not break into the NOV building as the vendor reported and notes that nothing was stolen from the building. Heard argues that this reason was pretextual because both Slack and Heard's manager, Barajas, thought that there was not enough evidence to terminate Heard for the alleged break-in. (Engel Depo. at 79; Slack Depo. at 142–43,

Exs. 22, 26, 28).  The summary-judgment evidence shows that NOV had investigated and had a good-faith reasonable belief that Heard had broken into the building.

NOV is entitled to judgment as a matter of law on Heard's retaliatory termination claim because he fails to raise a genuine factual dispute material to determining whether, but for his complaints of harassment, he would not have been fired.  Summary judgment is granted on this claim.

### 6. Billy Rose

Rose alleged that NOV retaliated against him by unjustly disciplining him.  (Docket Entry No. 60 at 47).  Rose alleged that after he "voiced objection to the use of the racial slur," he was disciplined in March 2011 for "coming in early."  (Docket Entry No. 60 at 29).  NOV moved for summary judgment, arguing that Rose did not experience a materially adverse employment action and could not establish the but-for causal link between his objections and the discipline he received.  (Docket Entry No. 78 at 45).  Rose did not address his retaliatory-discipline claim in his response to the motion for summary judgment.  (Docket Entry No. 80).

NOV argues that Rose did not experience a materially adverse employment action because Rose was never written up for coming in early.  (Docket Entry No. 78 at 45).  Rose testified that he believed he was supposed to be written up for coming in early but never saw or signed a write up.  (Rose Depo. at 239–40).  Rose presents no competent summary judgment evidence that he was written up for coming in early.  Merely warning that he might be written up is not sufficient.

Rose has not raised a sufficient basis to infer a causal link between his "voiced objection to use of the racial slur" and discipline.  Summary judgment is granted on Rose's retaliatory discipline claim.

### 5.     Jerome Johnson

Johnson alleged retaliation in NOV's denial of a promotion and in discipline it imposed. (Docket Entry No. 60 at 47).

### a.     Denial of Promotion

Johnson claims that NOV retaliated against him by denying him a promotion after he complained about racist comments in the workplace.  Johnson alleged he complained to manager Chris Little sometime in late 2010 about supervisor Hurl's comments about the an African-American coworker's hair.  (Johnson Depo. at 122).  Johnson applied for a field technician position in August 2011, but did not receive it.  (*Id.* at 198).

NOV moved for summary judgment, arguing that Johnson was not subjected to a materially adverse employment action.  (Docket Entry No. 78 at 44).  NOV argues that "any employment action Johnson experienced cannot be 'materially adverse' because it did not dissuade him from signing his Charge of Discrimination for submission to the EEOC on December 16, 2011."  (*Id.*). NOV cites *De Hart v. Baker Hughes Oilfield Oper., Inc.*, 214 Fed. App'x (5th Cir. 2007), in support of its argument.  An employee's filing of an EEOC charge does not preclude a finding that the employee was retaliated against.  In *De Hart*, the Fifth Circuit found that an employee's filing of an EEOC charge more than seven months before she was fired was insufficient, standing alone, to show the causal link.  But, the court in *De Hart* did not conclude, as NOV argues here, that any plaintiff who files an EEOC charge after the alleged retaliation occurred cannot proceed on the claim.

NOV's motion for summary judgment on Johnson's retaliatory failure-to-promote claim is denied.

### b.     Discipline

80

Johnson also claims that NOV retaliated against him for complaining to Little by giving him a Final Warning for missing a shipment.  Johnson alleges that after he complained to management, "things got worse for me in that department," his workload increased significantly, and he was issued a Final Warning for missing a shipment.  (Johnson Depo. at 124, 129, Ex. 7).  Only the write-up for failing to make a shipment was a form of discipline.

NOV moved for summary judgment, making the same argument that filing the EEOC charge after the alleged retaliation forecloses the retaliation claim.  That argument is unpersuasive.  NOV also argues that Johnson cannot show a causal link between his complaints and the Final Warning.

Johnson complained to Little about Hurl's comments.  (Johnson Depo at 122).  Johnson testified that Little told him that he would talk to Hurl.  (Docket Entry No. 80 at 58).  Evans, not Little or Hurl, gave Johnson the Final Warning.  Johnson has not alleged that Evans knew about Johnson's complaint to Little about Hurl's comments, and has not identified or submitted evidence to support such an inference.

Summary judgment is granted on Johnson's retaliatory discipline claim.

### 6.    Edward Jiles

Jiles asserted claims for retaliation in NOV's decisions to suspend him for a day and later, to terminate his employment.  (Docket Entry No. 60 at 47).

### a.    Suspension

Jiles claims that NOV retaliated against him for complaining about racial discrimination by suspending him.  (Docket Entry No. 60 at 149, 161–62).  Jiles contends that after he complained to the human resources department that Barajas called him a "nigger," he was suspended in retaliation.  (Docket Entry No. 60 at 35, 38).  NOV  moved for summary  judgment, arguing that Jiles did not

81

engage in any protected activity. (Docket Entry No. 78-1 at 44). Jiles did not address NOV's argument in his response to the summary judgment motion. (Docket Entry No. 80).

Jiles testified that Barajas sent him home on September 15, 2011, because of poor work performance, telling him, "[g]o home and don't come back until I tell you to." (*Id.* at 118). Jiles claims that this was a suspension. Jiles promptly complained to the human resources department, which told him to return to work the next day. (*Id.* at 118–19). Jiles testified that when he returned on September 16, 2011, he and Barajas had a confrontation "in front of everybody" about his work performance. Jiles stated that Barajas called him a "nigger" under his breath, (*id.* at 119–20); Barajas denied it, (Barajas Depo. at 128). Jiles testified that he called human resources and left a message about the incident, but no one returned his call. (Jiles Depo. at 120).

Jiles's deposition testimony makes clear that he complained about Barajas's conduct *after* the alleged suspension when Barajas sent him home. Jiles presents no evidence that he engaged in protected activity before he was sent home for the day. Jiles's retaliatory suspension claim fails as a matter of law. *See DeHart*, 214 Fed. Appx. at 442 (per curiam) (unpublished) (no retaliation when the adverse action took place before the plaintiff's protected activity); *Zaffuto v. City of Hammond*, 308 F.3d 485, 492 (5th Cir. 2002) (same).

### b.    Termination of Employment

Jiles also claims that Barajas fired him in retaliation for complaining to the human resources department that Barajas called him a "nigger." (Docket Entry No. 60 at 49, 161). NOV moved for summary judgment, contending that Jiles did not report the use of epithets as he alleged. (Docket Entry No. 78-1 at 44).

Jiles was fired in March 2012. (Jiles Depo. at 69–84). Jiles testified that he called the human resources department to complain about Barajas's use of the word "nigger" on September 16, 2011, but no one answered the phone and Jiles did not leave a message. (Jiles Depo. at 118–19). Jiles testified that he "never got in touch" with the human resources department. (*Id.*). Jiles also testified that he did not report Jasso's or Guajardo's use of the word "nigger" to anyone at the human resources department. (*Id.* at 128, 132–34). Jiles testified that the only time he complained to the human resources department about workplace conduct was on September 15, 2011, when Barajas sent him home from work. (*Id.* at 138). The absence of evidence that Jiles complained to the human resources department about Barajas's epithets, as he alleged, undermines this claim.

In addition, the six-month lapse between Jiles's call to the human resources department and the date he was fired undermines the causal link. *See Bell v. Bank of America*, 171 Fed. App'x 442, 444 (5th Cir. 2006) (unpublished) (seven-month lapse failed to support causal link); *Myers v. Crestone Intern., LLC*, 121 Fed. App'x 25, 28 (5th Cir. 2005) (unpublished) (three-month lapse failed to support causal link); *Harvey v. Stringer*, 113 Fed. App'x 629, 631 (5th Cir. 2004) (unpublished) (ten-month lapse failed to support causal link); *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471–72 (5th Cir. 2002) (five-month lapse failed to support causal link).

In *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992), the Fifth Circuit held that a casual link existed despite a fourteen-month lapse, but in *Shirley*, the employee had worked for nine years without a single oral or written reprimand until she filed an EEOC charge, at which point the employer "suddenly found three so-called flagrant indiscretions or violations, which it accused this plaintiff of committing." Here, unlike in *Shirley*, NOV gave Jiles repeated warnings, including two second warnings, and two third warnings, before the alleged complaint.

Even assuming that Jiles had made a *prima facie* showing, he has not raised a factual dispute as to whether NOV would have fired him but for retaliation, given the evidence of excessive absences, disciplinary history, and failure to provide documents showing a doctor's appointment when requested to do so.  (Guajardo Depo. at 59–60).  Jiles presents no evidence or argument that NOV's legitimate, nonretaliatory reasons are pretextual.  NOV is entitled to judgment as a matter of law on Jiles's retaliatory termination of employment claims.

### 7.     DeWarren Bellard

Bellard asserts retaliation claims for wrongful discipline, suspension, and termination. Bellard claims that NOV retaliated against him for complaining to Lemen that Jasso called him a "black African monkey," and for complaining to Evans about "racial slurs in the work place." (Docket Entry No. 80 at 49–50).  NOV moved for summary judgment, arguing that Bellard did not engage in protected activity and that the persons who disciplined, suspended, and terminated him did not know about Bellard's complaints.  (Docket Entry No. 78-1 at 41–42).

### a.     Discipline and Suspension

Bellard complained to Evans about "racial slurs in the work place" in January 2011.  (Bellard Depo. at 209–211; Bellard Affidavit at 2).  Bellard also complained to Lemen that Jasso had called him a "black African monkey."  On February 8, 2011 and March 4, 2011, Evans gave Bellard second and third warnings for pulling the wrong parts.  (Docket Entry No. 60 at 41; Bellard Depo. at Exs. 8, 9).  NOV also argues that Bellard's complaints to Evans did not refer to any discriminatory employment practice.  This ignores Bellard's testimony that he complained to Evans that there was "a lot of racism going on" and NOV "hadn't . . . addressed the problem."  (Bellard Depo. at 210). Bellard has shown that he engaged in protected activity.  NOV also argues that Bellard's discipline

was not a materially adverse employment action because "it did not dissuade Bellard from filing his EEOC charge of discrimination."  But filing an EEOC charge does not preclude a plaintiff from pursuing a retaliation claim.

Finally, NOV argues that Bellard cannot show a causal link between his discipline and the complaints he made.  The summary judgment evidence shows that Bellard complained to Evans and that Evans was the one who disciplined him by issuing warnings within two months after the complaints.  "[T]emporal proximity alone, when very close, can in some instances establish a *prima facie case* of retaliation."  *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007) (citing *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).  Bellard has made a *prima facie* showing of retaliation.

Bellard has not, however, presented or identified summary-judgment evidence showing the necessary casual connection.  Bellard does not dispute that he made the errors that led to the disciplinary warnings.  He has not presented or identified summary-judgment evidence supporting an inference that, but for his complaints, NOV would not have suspended him or issued the warnings.  The retaliatory discipline and suspension claims fail as a matter of law.  *McCoy,* 492 F.3d at 562.

### b.      Termination

Bellard claims that Evans retaliated against him by firing him in January 2011.  NOV moved for summary judgment, asserting that Bellard was fired for poor performance.  (Docket Entry No. 78-1 at 31–33).  Bellard contends that after he went on medical leave, Barajas and Evans sought to have him fired.  (Docket Entry No. 80 at 31).  Slack testified that she told Barajas that Bellard could not be terminated while he was on leave.  (Docket Entry No. 90-10 at 7-9, 22-24).  Barajas sent

Slack an e-mail explaining that Bellard was "due a final write up which will lead to termination." (Slack Depo. at Ex. 8).  After Barajas returned to work, he was terminated based on the final write-up for conduct.

NOV is entitled to summary judgment on Bellard's discriminatory termination claim because, assuming a *prima facie* showing, Bellard neither submits nor identifies competent summary-judgment evidence showing that, given the extensive record of "ongoing poor performance, evidenced by the numerous corrective actions and counseling he received during his last year of employment," (Docket Entry No. 78-1 at 33), NOV would not have fired him but for retaliation for his complaints.  The intervening medical leave further undercuts Bellard's claims. (Bellard Depo. at 186).  Bellard points to no evidence to controvert these contentions.  Summary judgment is granted on Bellard's retaliatory termination claims.

## IV.   Conclusion

NOV's motion to dismiss or strike, and motion for summary judgment, are granted in part and denied in part.  A status conference is set for **October 28, 2014**, at 5:00 p.m.

SIGNED on September 30, 2014, at Houston, Teas.

Lee H. Rosenthal
United States District Judge